FALK v STATE BAR OF MICHIGAN

Docket No. 60722. Argued June 5, 1979 (Calendar No. 5).—Decided
    April 29, 1981. Rehearing denied *post,* 1157, without prejudice
    to plaintiff's presenting the issues raised in further proceedings
    in this pending case.

    Allan Falk, a member of the State Bar of Michigan, brought an
        original action in the Supreme Court against the State Bar of
        Michigan which the Court treated as an action for a writ of
        superintending control. The complaint essentially seeks an
        order relieving the plaintiff of paying that part of his State Bar
        dues which relates to activities of the State Bar which he
        alleges to be "unlawful and unconstitutional" as an infringe-
        ment on his First Amendment rights. Maurice E. Schoenberger,
        J., appointed as master, conducted a hearing and made findings
        of fact on the issues presented. The case was then argued in the
        Supreme Court.

        The Court announced in a per curiam decision that there was
        no majority of the Court for a decision which would determine
        the matter, and ordered that a master be appointed to conduct
        an additional evidentiary hearing. A record shall be further
        developed as to the Young Lawyers Section and Lawyers Wives
        of Michigan, the Lawyer Placement Service, the commercial
        sale of the State Bar's mailing list, and, particularly, activities
        of the State Bar addressed to influencing legislation.

        In addition, three separate opinions were filed:

        Justice Ryan, joined by Justices Fitzgerald and Moody, would
        hold that the state may exact compulsory dues, and require
        association, to support only those duties and functions of the

REFERENCES FOR POINTS IN HEADNOTES
[1-3, 5-12, 14, 16-18, 21-27, 29-33] 7 Am Jur 2d (Rev), Attorneys at Law
    § 7.
  16A Am Jur 2d (Rev), Constitutional Law § 541.
[4] 16A Am Jur 2d (Rev), Constitutional Law § 558.
[13, 15] 7 Am Jur 2d (Rev), Attorneys at Law § 12.
[19, 20] 7 Am Jur 2d (Rev), Attorneys at Law §§ 8, 9.
  Validity and construction of rules setting up client security fund. 53
    ALR3d 1298.
  Maintenance of lawyer reference system by organization having no
    legal interest in proceedings. 11 ALR3d 1206.
[28] 16A Am Jur 2d (Rev), Constitutional Law § 613.

State Bar which serve a compelling state interest and which cannot be accomplished by means less intrusive upon the First Amendment rights of the objecting individuals affected. He enumerated those duties and functions in his opinion, and others which may not be supported by dues, including legislative and lobbying activities, and those activities solely designed to further the commercial interests of the membership. He would allow the bar to present further facts to the Court, through a master, only as to those activities for which the record is inadequate to demonstrate a compelling interest.

1. The Supreme Court rules concerning the integrated State Bar of Michigan in 1935 had a declaration of purposes which has not been materially altered by any restatement in the subsequent 44 years. Those purposes are: to aid in the promotion of improvements in the administration of justice and the advancement of the science of jurisprudence, in the improvement of the relations between the profession and the public, and in the promotion of the interests of the legal profession in this state. Since 1935, the privilege of practicing law in Michigan has been conditioned upon association with, and financial support of, the integrated State Bar of Michigan.

2. First Amendment protections are not absolute. The compelling interests of government may justify restrictions on the First Amendment freedoms of individuals, but encroachment cannot be justified upon a mere showing of a legitimate state interest. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. The means chosen must be the least restrictive of freedom of belief and association in achieving the end, and the benefit gained must outweigh the loss of constitutionally protected rights.

3. This case is concerned with the propriety of compulsion by the state to associate in, and to support financially, a public body corporate as a condition precedent to the pursuit of one's livelihood as an attorney in this state, in any active legal capacity. No alternatives, even unpalatable ones, exist for the objecting attorney. Mr. Falk's pleading raises issues involving his rights of freedom of association and freedom of belief. The requirement of association with, and financial support of, the integrated State Bar clearly has a significant effect on these rights.

4. First Amendment guarantees are made applicable to the several states through the Due Process Clause of the Fourteenth Amendment. It is well established that state action which infringes on First Amendment rights can be tolerated

only where such infringement is unavoidably required in order to further a compelling, paramount, or vital state interest. Unquestionably, the state has very strong interests in the regulation of, and maintenance of high standards in, the legal profession, since lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts. Nonetheless, and although the permission to practice law may rightly be regarded as a privilege, the state's intrusion on First Amendment rights of all persons, including attorneys, must be consciously and scrupulously minimized. In the light of controlling First Amendment principles, the State of Michigan, through the combined action of the Court, the Legislature, and the State Bar, may compulsorily exact dues, and require association, to support only those duties and functions of the State Bar which serve compelling state interests and which cannot be accomplished by means less intrusive upon the First Amendment rights of individual attorneys.

5. The regulation of the practice of law, the maintenance of high standards in the legal profession and the discharge of the profession's duty to protect and inform the public are, in the context of this challenge, purposes in which the State of Michigan has a compelling interest which will justify unavoidable intrusions on the First Amendment rights of objecting attorneys. Once a person has stated a claim upon which relief can be granted under the First Amendment, the burden is on the state or its agency to show the existence of a compelling interest which cannot be achieved with less intrusion upon the affected individual's First Amendment rights. The record in this case establishes that the defendant State Bar of Michigan has shown a compelling state interest in the following functions of the State Bar, and that such functions cannot be accomplished by means less intrusive on the First Amendment rights of objecting attorneys: a) All regulatory activities, including attorney disciplinary proceedings as provided in Chapter 95 of the General Court Rules, to the extent that they are funded out of compulsory State Bar dues; all licensing-related activities such as those provided for in State Bar Rule 15; b) All continuing legal education activities presently engaged in by the State Bar which are directed to the maintenance of high professional standards among Michigan attorneys; c) The publication of the Michigan Bar Journal insofar as that publication is primarily devoted to informing the members of the State Bar on current matters relating to regulation of the profession and the improvement of professional standards; d) The Client Security

Fund insofar as it represents a discharge of a duty to protect the public from recreant members of the profession; e) Those activities designed to educate the general public concerning the use of legal services and the relationship between individuals and the legal system generally but excluding education concerning specific legislation or promoting specific viewpoints; and f) Activities designed to make legal services more accessible including the Lawyer Referral Service and support for those legal aid organizations serving the indigent.

6. The political and legislative activities supported by the State Bar, which are wholly separable from its other activities, violate petitioner Falk's First Amendment rights of association and expression. The record clearly discloses the extent of the State Bar's legislative and lobbying activities, including rendering technical advice to the Legislature, testifying before the State Officers Compensation Commission, adopting and publishing official State Bar positions on proposed legislation, and retaining a professional lobbyist. To the extent those efforts are funded by mandatory dues, the State Bar impermissibly infringes on the First Amendment freedoms of its individual members.

7. The ultimate objective of political and legislative activity by the State Bar is to influence public decision-making. Even if the particular goal can be justified as advancing the public interest or improving the administration of justice, compelled support and association to further these activities is not constitutionally acceptable. The public interest and the administration of justice are not subject to a single interpretation. Disagreements regarding legislative or other policy choices arise not only because they result in different practical effects on individuals, but more importantly because they reflect differing ideological approaches to the subject. Such ideological beliefs, and association to promote or oppose them, lie at the core of those activities protected by the First Amendment. That petitioner Falk is entitled to express his disagreement within the organization does not wholly diminish the fact that he is being forced to associate for purposes contrary to his beliefs. The focus is not on freedom of expression within the organization, but rather on whether the state can justify the forced association in the first instance.

8. For purposes of the First Amendment, a distinction cannot be drawn between legislation aimed at issues loosely termed procedural, *e.g.*, court reorganization, rules of evidence in product liability actions and the like, and those termed substantive. In either category the choice is necessarily based on a premise

which is subject to contrary opinion or belief. Compelling a dissenter to finance the encouragement of such legislation and associate with its advancement, whether or not he or she opposes it, cannot be justified in the absence of an overriding state need and then only by means narrowly drawn. In the light of alternative methods available to the Legislature to inform its decision-making both as to substantive and procedural legislation, there is no compelling state interest to justify the State Bar's legislative activities supported by compulsory dues. Specifically, the Legislature possesses the power of subpoena, and has access to the Legislative Service Bureau and legal counsel, and there are voluntary and self-supporting sections within the State Bar from whom the Legislature can seek advice. Further, individual members of the State Bar may voluntarily support legislative and lobbying activities undertaken by the State Bar.

9. The activities of the State Bar which are designed to further the commercial and economic interests of the members cannot survive First Amendment scrutiny. Attorneys cannot be categorized as a group with homogeneous economic interests. In fact, the economic interests of different attorneys often are in direct conflict. Such conflicts, and the requirement that members contribute to an association which may, therefore, undercut their self-interests, cannot be ameliorated by the democratic process within the bar. More importantly, furtherance of the commercial interests of attorneys cannot constitute a compelling governmental interest. Since the end itself cannot be justified, the means designed to serve that end, such as the Lawyer Placement Service, must fall in the face of a First Amendment challenge. As to all other activities of the State Bar, the present record fails to demonstrate a compelling state interest which cannot be served by a means less intrusive on the First Amendment rights of an objecting individual attorney.

10. The State Bar of Michigan should be enjoined from disbursing compulsorily exacted dues for any functions of purposes other than those which are unavoidably necessary to the furtherance of compelling state interests. It might then solicit voluntary contributions from members for those purposes. The bar would be permitted to present further facts only as to those activities as to which the record is inadequate. The bar should determine the proportion of dues which does not relate to constitutional purposes and functions, and reduce the dues accordingly at the start of its next fiscal year.

Justice Williams, joined by Chief Justice Coleman, would

deny the request for relief except as for removal of Falk's name from the roster sold for commercial use. There is no showing of a violation of the plaintiff's First Amendment rights by the activities complained of, except for the sale of the use of the State Bar mailing roster for commercial purposes, which is an invasion of the plaintiff's right to privacy. There is no reference in the record to political activities by the State Bar, such as support of, or opposition to, partisan candidates and partisan issues, which would be offensive to the State Bar Rules and the First Amendment.

1. Courts have an inherent power to regulate the practice of law and to supervise those persons engaged in it to the extent necessary for their proper functioning. The provisions of the statute which created the State Bar clearly indicate that it was the intent of the Legislature to provide for the organization of an agency to perform and assist in performing functions that pertain to the judiciary. Such matters are within the inherent power of the judiciary, but because there has been legislative action on the subject, there is no necessity for the Court now to assert its inherent power to create an integrated state bar. State Bar Rule 1 with its broad injunction to aid in promoting improvements in the administration of justice is consonant with the legislative purpose that the Supreme Court provide for the "regulation" of the State Bar. There is no rule of statutory construction which would confine "regulation" of the State Bar exclusively to matters such as regulation and discipline of the profession, continuing legal education, and related licensing functions, as well as the associated administrative functions, in the sense the plaintiff advocates. The State Bar can achieve such worthy results as restoring public confidence in the State Bar, enlarging professional consciousness, energizing the State Bar's responsibility to the public, improving the administration of justice, and being the only means by which every member of the State Bar can share in its public and professional responsibility. To provide the flexibility necessary to achieve such results the Legislature must have intended "regulation" to be defined expansively. Furthermore, it is undoubted that the Court has the inherent power to include in its rules and regulations for the State Bar the purposes stated in Rule 1.

2. The First Amendment is not absolute but will give way to certain state activities which are germane to a compelling state interest where the intrusion indirectly affects the First Amendment right. The state has a compelling interest in promoting improvements in the administration of justice and advancing the science of jurisprudence in order to fulfill its function of

protecting the health, safety, and welfare of its citizens. Insofar as the State Bar Rules authorize the bar to aid in those activities, it embodies a compelling state interest. The issue is whether the activities complained of are germane to that state interest.

3. The plaintiff's major complaint is that the State Bar spends large sums of money to influence pending legislation and to fund committee study projects which result in recommendations of policy for executive, legislative, or administrative action. There is nothing in the record to indicate that the State Bar participates in partisan politics. The plaintiff argues that the State Bar is a union shop which may not coerce its members to finance "ideological expenditures". However, what the Supreme Court of the United States has proscribed is the expenditure of compulsory dues for ideological causes which are not germane to the duties for which dues are collected. The state's interest in this case is in the administration of justice and in the advancement of jurisprudence. The use of State Bar dues to influence legislation and to fund committee study projects, so long as it is confined to those subjects directly affecting the administration of justice or the advancement of jurisprudence, is germane to the state's legitimate interest and therefore survives attack under the First Amendment.

4. In comparing this case with one dealing with use of compulsory dues by a labor union, the question is not the superficial similarities between an integrated state bar and a labor union, but whether the compelling state interest justifying intrusion on First Amendment rights is the same in both cases. It is not. One is achieving labor peace through collective bargaining, the other the administration of justice. Obviously, what might be germane to collective bargaining in the case of a labor union could be quite different from what is germane to the administration of justice in the case of the State Bar. Furthermore, the plaintiff has failed to specify even one political or ideological view of his which conflicts with those of the State Bar; his challenges appear to be monetary rather than ideological. However, even if the plaintiff objects to certain State Bar views, he is still free to voice his own views on any subject in any manner he wishes. Everyone understands, or should understand, that the views expressed by the State Bar are separate and distinct from those of each member. The plaintiff may take part in the communications within the State Bar on these matters or may express his views through external means, such as the press. When taking a position on a proposed bill, rule, or administrative order, the State Bar must

confine itself to subjects directly affecting the administration of justice or the advancement of jurisprudence, but the petitioner has failed to show any specific expenditure of State Bar funds unrelated to those goals.

5. The Young Lawyers Section can help the new attorney bridge the gap between law school and the practice of law. This helps the legal system to run effectively and provides for a better distribution of legal services to the public and thus is germane to the compelling state interest in the administration of justice. The plaintiff is free to dissociate himself from the Young Lawyers Section; automatic membership does not mean that it is compulsory. Therefore, the plaintiff cannot complain that the activities of this section to train new attorneys violate his First Amendment right to freedom of association.

6. The Lawyer Referral Service and Prepaid Legal Services programs were created to make legal services more accessible to persons who otherwise might not consult lawyers. The purpose of the Client Security Fund is to protect the public by reimbursing victims who have claims against lawyers which would not be covered under professional liability insurance. These activities clearly constitute permissible public purposes within the meaning of the constitutional provision concerning appropriation of public money. The Lawyer Placement Service also provides a necessary and useful service for the legal profession and the general public. The gathering and dispersal of employment information aids the effective use and delivery of legal services where they are needed, which is also germane to the administration of justice.

7. A legal system, no matter how fair or just, is of little value if no one knows of its existence or how to use it effectively. By providing the public with pamphlets explaining the law in easily understandable language the State Bar is helping the people of Michigan gain effective access to the legal system. Similarly when the Lawyers Wives of Michigan volunteer time and effort to distribute brochures to school children, conduct essay contests for Law Day, and serve as volunteers for probate and juvenile courts, they are aiding the state legal system. Therefore, the expenditure of State Bar dues for public communications, Lawyers Wives and Children's Charter is germane to the state's compelling interest.

8. The plaintiff's complaint that justices and other judges should not be present at social occasions sponsored by the State Bar are not within the original jurisdiction of the Court, and the plaintiff is advised to seek the proper forum. As to his complaint that food and beverages are offered on particular

occasions such as the State of the Judiciary Address and Law Day, the pertinent question is whether the dining and drinking is germane to a more significant activity which fulfills the compelling state interest in the improvement of the administration of justice and the advancement of jurisprudence. For example, in connection with Law Day, the winners of an essay contest and their parents and teachers are brought to Lansing for a luncheon sponsored by the State Bar, at which the awards are presented. The luncheon is certainly a legitimate expense of an educational program to acquaint the public with the system of justice. Such expenditures, in connection with the State of the Judiciary Address and Law Day, for example, if otherwise proper, do not offend the plaintiff's First Amendment rights.

9. The Supreme Court is an inappropriate forum in which to initiate a complaint that permitting the State Bar to lobby for higher salaries for judges violates the Code of Judicial Ethics. The plaintiff also argues that such lobbying before the State Officers Compensation Commission violates his First Amendment freedoms of association and speech. Employment of competent jurists is essential for the effective administration of justice. The commission was established to insure that the state pays salaries which enable it to compete with private employers for well-qualified and dedicated persons. There is nothing improper in the State Bar aiding in the determination of what salaries are necessary to have an effective judiciary. Therefore, permitting the State Bar to express its opinion concerning judicial salaries is germane to the state's interest.

10. The plaintiff's right to privacy, the right to be left alone, inherently includes some discretion in what enters his home through the mail. Congress has recognized this by giving the addressee the right to stop mailings which he believes to be erotically arousing or sexually provocative, and the Supreme Court of the United States has indicated that the addressee should be allowed to strike his name from any mailing list. Even though the soliciting mail comes in clearly marked envelopes, the plaintiff has the right to demand that his name be excluded from the State Bar's mass merchandising mailing lists which cannot be said to be promoting the administration of justice or advancing the science of jurisprudence.

The order of superintending control should be denied, except that the State Bar shall, upon the plaintiff's request, remove his name from the mailing roster of attorneys sold for commercial use.

Justice Levin, joined by Justice Kavanagh, wrote that the

record is sufficiently developed to resolve some of the issues but not others, and that therefore the cause should be remanded for a further hearing.

1. The record is sufficiently developed to resolve the challenges to all activities of the State Bar save the Lawyer Placement Service, the commercial sale of the State Bar's mailing list, activities addressed to influencing legislation, and the activities of the Young Lawyers Section and of the Lawyers Wives beyond those directly educating members of the bar and the public about the law and the legal system.

2. This case is not an ordinary litigation in which a party is limited to the relief to which he has proven himself entitled. Falk's petition calls for the discretionary exercise of the Court's extraordinary superintending control. Therefore, the Court must consider not merely the relative rights of the parties before the Court but, rather, the proper organization and actions of the State Bar in the light of the rights of all of its members and the interests of the state. When the Court exercises its power of superintending control, the Court has the responsibility of ensuring that it is fully informed. A more complete factual record is needed to determine the appropriate order as to the State Bar's legislative activities, the Lawyer Placement Service, the commercial sale of the State Bar's mailing list, and the activities of the Young Lawyers Section and of the Lawyers Wives beyond those directly educating members of the bar about the law and the legal system, and therefore the cause is remanded for the purpose of developing such a record.

3. The principles of constitutional law announced by the Supreme Court of the United States may be read differingly in regard to the standard or standards of judicial scrutiny applicable to this case. Application of the constitutional principles is further hampered by the indefiniteness, on this record, of the purposes and state interests served by the State Bar. The lawyer's relation to the law could rationally support the State Bar's taking a stand on even the most basic of public policy issues. At some point, the interests of the State Bar and of the state in collective legislative activity by the State Bar must yield to the constitutional freedoms of the individual lawyer.

4. It is unnecessary at this time to determine the appropriate standard of judicial scrutiny or to articulate definitively the State Bar's purpose, since such of Falk's challenges to activities of the State Bar as can be resolved on this record are clearly permissible even under the strictest standard of review and the

narrowest construction of the State Bar's purpose. The regulatory and licensing activities of the State Bar narrowly drawn to the end of maintaining high standards of competence and honesty in the legal profession serve a compelling state interest and can be justified even if they impinge on members' First Amendment rights. Included among these activities are continuing legal education, the Michigan Bar Journal to the extent that it serves an informational function, advisory opinions on ethical questions, and disciplinary proceedings.

5. Improvement of the administration of justice includes, at the very least, activities primarily to educate the public about the law and legal services, to provide legal services to the indigent, to help the public to select legal counsel through the Lawyer Referral Service, and to provide forums for discussion of problems facing the courts and the legal profession. That the state has a compelling interest in improving the administration of justice through activities such as these needs no explication. Compulsory dues are a necessary means both to provide adequate funds and to share the burden equitably among those subject to the duty. Limiting the compulsory element to a reasonable level of dues is the least intrusive means available.

6. Some of the non-legislative activities of the State Bar challenged by Falk fall comfortably within the permissible range of this category of activities. The preparation and distribution by the Young Lawyers Section of the Juror's Manual, the distribution to junior high school students of the "You and the Law" booklet by the Lawyers Wives of Michigan, and funding of the Children's Charter, which provides a forum for discussing problems of juvenile delinquency requiring participation of third parties, are examples of clearly permissible activities. Other activities of the State Bar, including activities of the Young Lawyers Section and Lawyers Wives other than those described above, the Lawyer Placement Service, the commercial sale of the State Bar's mailing list, and particularly bar activities addressed to influencing legislation, require development of a fuller and more particularized record before their permissibility can be determined.

7. On remand, the burden will be on Falk to show specific activities which infringe upon his First Amendment rights. The burden will be on the State Bar to establish the requisite state interest, the appropriate connection between particular activities and the state interest (or, if a valid criterion for First Amendment purposes, the economic self-interest of the bar's members), and the unavailability or impracticability of alternative means of realizing the asserted state interest. The appro-

priate standard either of judicial scrutiny or definition of the state interests served by the State Bar is not now decided.

8. The parties should also address whether a fair analysis of the purposes served by those activities of the State Bar presenting close questions of constitutional conflict and of alternatives indicate that a better course would be to exercise the superintending authority of the Court by court rule to limit the activities of the State Bar to a greater degree than is absolutely compelled by the Constitution, and thereby eliminate the potential for constitutional conflict. Such an approach may not only serve the important goal of avoiding unnecessary decision of constitutional questions, but may also provide a desirable measure of flexibility in an area that will almost certainly change with time. Further, a proper respect for the "breathing room" necessary for full enjoyment of First Amendment rights suggests that the Court should be reluctant to allow bar activities to press upon the border of constitutional prohibition, absent a clearly demonstrated need.

### OPINION OF THE COURT

1. ATTORNEY AND CLIENT — STATE BAR — SUPERINTENDING CONTROL.

An action for superintending control over the State Bar challenging activities supported by compulsory dues as infringing on an objecting member's First Amendment rights requires the development of an adequate record of the activities of the State Bar, and particularly those activities addressed to influencing legislation, for the Court to agree upon a decision in the matter (US Const, Ams I, XIV; Const 1963, art 6, § 4; MCL 600.215, 600.219, 600.904; MSA 27A.215, 27A.219, 27A.904; GCR 1963, 711, 851[6]).

### SEPARATE OPINION BY RYAN, J.

2. ATTORNEY AND CLIENT — STATE BAR — PURPOSES.

*The Supreme Court rules concerning the integrated State Bar of Michigan have as their purposes aiding in the promotion of improvements in the administration of justice and the advancement of the science of jurisprudence, in the improvement of the relations between the profession and the public, and in the promotion of the interests of the legal profession in this state (Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

3. ATTORNEY AND CLIENT — STATE BAR — MEMBERSHIP.

*The privilege of practicing law in Michigan is conditioned upon association with, and financial support of, the integrated State*

*Bar of Michigan compelled by the state (Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 3, 4).*

4. CONSTITUTIONAL LAW — FIRST AMENDMENT — DUE PROCESS — STATE ACTION.

*State action which infringes on First Amendment rights can only be tolerated where such infringement is unavoidably required in order to further a compelling, paramount, or vital state interest (US Const, Ams I, XIV).*

5. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The State of Michigan, through the combined actions of the Supreme Court, the Legislature, and the State Bar, may compulsorily exact State Bar dues, and require association in the State Bar, to support only those duties and functions of the State Bar which serve compelling state interests and which cannot be accomplished by means less intrusive upon the First Amendment rights of objecting attorneys (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

6. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The state has a compelling interest in the regulation of the practice of law, the maintenance of high standards in the legal profession, and the discharge of the profession's duty to protect and inform the public which justifies unavoidable intrusions on the First Amendment rights of objecting attorneys (US Const, Ams I, XIV).*

7. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The State Bar of Michigan has shown a compelling state interest which cannot be accomplished by means less intrusive on the First Amendment rights of an objecting attorney than compulsory payment of State Bar dues in the following State Bar activities: all regulatory activities, including attorney disciplinary proceedings, to the extent that they are funded out of compulsory State Bar dues, and all activities related to licensing of attorneys; all continuing legal education activities presently engaged in by the State Bar which are directed to the maintenance of high professional standards; the publication of the Michigan Bar Journal insofar as it is primarily devoted to informing the members of the State Bar on current matters*

*relating to regulation of the profession and the improvement of professional standards; the Client Security Fund insofar as it represents a discharge of a duty to protect the public from recreant members of the profession; those activities designed to educate the general public concerning the use of legal services and the relationship between individuals and the legal system generally; and activities designed to make legal services more accessible (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; GCR 1963, 950 et seq.; State Bar Rules 1, 15).*

8. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The political and legislative activities of the State Bar, to the extent they are funded by mandatory State Bar dues, violate the First Amendment rights of an objecting attorney to freedom of association and expression; such activities include rendering technical advice to the Legislature, testifying before the State Officers Compensation Commission, adopting and publishing official State Bar positions on proposed legislation and retaining a professional lobbyist (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

9. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*Compelling a dissenting attorney to finance the encouragement of legislation and associate with its advancement cannot be constitutionally justified in the absence of an overriding state need and then only by means narrowly drawn; for purposes of the First Amendment, a distinction cannot be drawn between legislation aimed at issues loosely termed procedural and those termed substantive because in either case the choice is necessarily based on a premise which is subject to contrary opinion or belief (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

10. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*There is no compelling state interest to justify support by compulsory State Bar dues of legislative activities where the Legislature has alternative methods available to inform its decisionmaking, i.e., the power of subpoena, and access to the Legislative Service Bureau and legal counsel, and to voluntary and self-supporting sections within the State Bar (US Const, Ams I,*

*XIV; Const 1963, art 6, § 5; MCL 4.101, 600.901, 600.904; MSA 2.181, 27A.901, 27A.904; State Bar Rule 1).*

11. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*Activities of the State Bar designed to further the commercial interests of its members; such as the Lawyer Placement Service, cannot constitute a compelling state interest that cannot be accomplished by means less intrusive upon the First Amendment rights of objecting attorneys (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

SEPARATE OPINION BY WILLIAMS, J.

12. CONSTITUTIONAL LAW — STATE BAR — INTEGRATION — INHERENT POWER.

*The Supreme Court has the inherent power to regulate the practice of law and to supervise those persons engaged in it to the extent necessary for the proper functioning of the courts, but because there has been legislative action on the subject, there is no necessity for the Court to now assert its inherent power to create an integrated state bar (Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904).*

13. ATTORNEY AND CLIENT — STATE BAR — REGULATION — WORDS AND PHRASES.

*The broad injunction of Rule 1 of the State Bar to aid in promoting improvements in the administration of justice is consonant with the legislative purpose that the Supreme Court provide for the "regulation" of the State Bar; there is no rule of statutory construction which would confine "regulation" of the State Bar exclusively to regulation and discipline of the profession, continuing legal education, and related licensing functions, and the associated administrative functions (MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

14. ATTORNEY AND CLIENT — STATE BAR — REGULATION — LEGISLATIVE PURPOSE.

*The Legislature must have intended that "regulation" of the State Bar, as used in the statute creating the integrated State Bar, be defined expansively to provide for the Supreme Court the flexibility to insure that the State Bar can achieve such worthy results as restoring public confidence in the bar, enlarging professional consciousness, energizing the bar's responsibility to the public, improving the administration of justice, and being the only means whereby every member of the State Bar*

can share in its public and professional responsibility (MCL 600.901, 600.904; MSA 27A.901, 27A.904).

15. ATTORNEY AND CLIENT — STATE BAR — COURTS — INHERENT POWER.

The Supreme Court has the inherent power, independent of legislation to include in its rules and regulations the provisions of State Bar Rule 1 that the State Bar shall aid in promoting improvements in the administration of justice and advancements in jurisprudence (State Bar Rule 1).

16. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

The test of claims that certain uses of compulsory State Bar dues indirectly infringe upon First Amendment rights of an attorney is whether the state has a compelling interest involved, and if so, whether the activities complained of are germane to that interest; insofar as the activities aid in promoting improvements in the administration of justice and the advancement of jurisprudence they are essential for the state's continued existence and therefore survive attack under the First Amendment (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).

17. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

The State Bar's use of compulsory dues to influence legislation and to fund committee study projects which result in recommendations of policy for executive, legislative, or judicial action is germane to the state's legitimate and compelling interest in the administration of justice and the advancement of jurisprudence; such activity survives attack under the First Amendment where there is nothing in the record to indicate that the State Bar participates in partisan politics and the plaintiff challenging the use of the dues does not specify any of his views which conflict with those advanced by the State Bar (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).

18. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

The State Bar, when it takes a position on proposed legislation, court rules, or administrative actions must confine itself to those subjects directly affecting the administration of justice or the advancement of jurisprudence; endorsing a particular candidate for office or lobbying for legislation which is unrelated to

*the improvement of the administration of justice is outside of
the scope of the State Bar Rules and also violates the First
Amendment rights of free speech and association of State Bar
members (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL
600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

19. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR —
    STATE INTEREST.

*The expenditure of compulsory State Bar dues for the Young
Lawyers Section, Prepaid Legal Services programs, the Lawyer
Referral Service, the Lawyer Placement Service, the Client
Security Fund, public education about the law, Lawyers Wives
of Michigan, Children's Charter of Michigan, certain State Bar
social functions, and appearances before the State Officers
Compensation Commission to support higher judicial salaries is
germane to the state's compelling interest in promoting im-
provements in the administration of justice; therefore, those
activities have not been shown to violate the First Amendment
rights of free speech and association of a member of the State
Bar (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL
600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

20. CONSTITUTIONAL LAW — STATE BAR — PUBLIC PURPOSE.

*The State Bar Lawyer Referral Service, Prepaid Legal Services
programs, the Client Security Fund and the Lawyer Placement
Service clearly constitute a permissible public purpose, rather
than a local or private purpose, within the meaning of the
constitutional provision concerning appropriation of public
money (Const 1963, art 4, § 30).*

21. CONSTITUTIONAL LAW — PRIVACY — STATE BAR — MAILING LIST.

*The right to privacy, the right to be left alone, inherently
includes some discretion in what enters one's home through the
mail; an attorney has the right to demand that his name be
excluded from the mailing list, the use of which the State Bar
sells to commercial advertisers, because it cannot be said to be
promoting the administration of justice or advancing the sci-
ence of jurisprudence (State Bar Rule 1).*

SEPARATE OPINION BY LEVIN, J.

22. ATTORNEY AND CLIENT — STATE BAR — SUPERINTENDING CONTROL.

*An action for superintending control over the State Bar challeng-
ing activities supported by compulsory dues as infringing on an
objecting member's First Amendment rights, a matter within
the Supreme Court's original jurisdiction, is not like ordinary
litigation, in which a party is normally limited to the relief to*

*which he has proven himself entitled; the case calls for the discretionary exercise of the Court's extraordinary superintending control and considers not merely the relative rights of the parties but, rather, the proper organization and actions of the State Bar in the light of the rights of all of its members and the interests of the state (US Const, Ams I, XIV; Const 1963, art 6, § 4; MCL 600.215, 600.219, 600.904; MSA 27A.215, 27A.219, 27A.904; GCR 1963, 711, 851[6]).*

23. SUPERINTENDING CONTROL — SUPREME COURT — DISCRETION. .

*It is the ultimate responsibility of the Supreme Court to ensure that its exercise of discretion to implement its power of superintending control is fully informed (Const 1963, art 6, § 4; MCL 600.215, 600.219; MSA 27A.215, 27A.219; GCR 1963, 711, 851[6]).*

24. SUPERINTENDING CONTROL — SUPREME COURT — DISCRETION — EVIDENCE.

*To allow inadequacies in the record in an action for superintending control to shape an order affecting the rights of persons other than the parties would be to cede control of the Court's discretion to the parties; if a more complete factual record is needed to determine the appropriate superintending order, it is the Court's responsibility to obtain it (Const 1963, art 6, § 4; MCL 600.215, 600.219; MSA 27A.215, 27A.219; GCR 1963, 711, 851[6]).*

25. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — POLITICAL ACTIVITY.

*The interests of the State Bar and of the state in collective legislative activity must yield at some point to the constitutional freedoms of the objecting individual lawyer (US Const, Ams I, XIV; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

26. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR — LICENSES.

*The support by compulsory dues of regulatory and licensing activities of the State Bar which are narrowly drawn to the end of maintaining high standards of competence and honesty in the legal profession can be justified as serving a compelling state interest even if they impinge on First Amendment rights of objecting members (US Const, Ams I, XIV; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

27. ATTORNEY AND CLIENT — STATE BAR — ADMINISTRATION OF JUS-
    TICE — CONSTITUTIONAL LAW — FIRST AMENDMENT.

*Improving the administration of justice properly includes at least
activities primarily designed to educate the public about the
law and legal services, to provide legal services to the indigent,
to help the public select legal counsel intelligently through the
Lawyer Referral Service, and to provide forums for discussion
of problems facing the courts and the legal profession (MCL
600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

28. CONSTITUTIONAL LAW — ADMINISTRATION OF JUSTICE — STATE
    INTEREST.

*That the state, through the Supreme Court, has a compelling
interest in improving the administration of justice is suffi-
ciently clear as not to need explication.*

29. CONSTITUTIONAL LAW — ADMINISTRATION OF JUSTICE — STATE BAR
    — COMPULSORY DUES — FIRST AMENDMENT.

*Limiting the compulsory element of membership in the State Bar
to a reasonable level of dues, with no requirement of participa-
tion beyond the financial obligation, is the means available to
aid in the state's compelling interest in improving the adminis-
tration of justice which least intrudes on the First Amendment
rights of objecting members (US Const, Ams I, XIV; MCL
600.901, 600.904; MSA 27A.901, 27A.904; State Bar Rule 1).*

30. CONSTITUTIONAL LAW — ADMINISTRATION OF JUSTICE — FIRST
    AMENDMENT — STATE BAR.

*Activities financially supported by the State Bar such as the
preparation and distribution by the Young Lawyers of the
Juror's Manual, the provision to students of the "You and the
Law" booklet by the Lawyers Wives of Michigan, and funding
of the Children's Charter of Michigan, fall comfortably within
the permissible range of activities which clearly aid the state's
compelling interest in improving the administration of justice
where an · objecting lawyer claims an infringement of First
Amendment rights (MCL 600.901, 600.904; MSA 27A.901,
27A.904; State Bar Rule 1).*

31. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR —
    BURDEN OF PROOF.

*The burden is on an objecting member to show specific activities
of the State Bar which infringe upon his First Amendment
rights; the burden is on the State Bar to establish the requisite
state interest, the appropriate connection between particular
activities and the state interest (or, if a valid criterion for First
Amendment purposes, the economic self-interest of the bar's*

*members) and the unavailability or impracticability of alternative means of realizing the asserted state interest (US Const, Ams I, XIV).*

32. ATTORNEY AND CLIENT — STATE BAR — SUPREME COURT — INHERENT POWER — CONSTITUTIONAL LAW — FIRST AMENDMENT.

*It may be better for the Supreme Court to limit activities of the State Bar supported by compulsory dues which arguably infringe upon an objecting member's First Amendment rights of association and belief by court rule, and thereby eliminate the potential for constitutional conflict; such an approach may not only serve the important goal of avoiding unnecessary constitutional decisions, but may also provide a measure of flexibility in an area which will almost certainly change with time (US Const, Ams I, XIV; Const 1963, art 6, § 5; MCL 600.904; MSA 27A.904; State Bar Rule 1).*

33. CONSTITUTIONAL LAW — FIRST AMENDMENT — STATE BAR.

*A proper respect for the "breathing room" necessary for full enjoyment of First Amendment rights suggests that the Supreme Court should be reluctant to allow activities of the State Bar supported by compulsory dues to press upon the border of the constitutional prohibition against infringing the First Amendment rights of an objecting attorney, absent a clearly demonstrated need (US Const, Ams I, XIV).*

*Allan Falk, in propria persona.*

*George E. Bushnell, Jr.,* and *Lynn H. Schecter* for defendant.

PER CURIAM. This matter comes before this Court pursuant to plaintiff's "Petition for Special Relief". In his petition the plaintiff sets forth his objections to a number of State Bar activities and asks that the petition "be granted".

Based on the record we have before us, three members of the Court are of the view that the plaintiff is entitled to partial relief and would order it to be afforded. Several issues, however, cannot be decided without further development.

Two members of the Court are of the opinion

that the plaintiff is not entitled to relief and would deny the petition.

Two members of the Court are of the view that further hearings on this matter are required, believing that the present state of the record is such that while some of the issues could be resolved based upon an evaluation of the record, several other issues should not be decided without further development.

In light of these circumstances, there being no majority of the Court at this time for a decision which would determine this matter, we order that the Honorable James H. Lincoln be appointed to conduct an additional evidentiary hearing. At this hearing the parties shall further develop the record with regard to the following bar activities: the Young Lawyers Section and Lawyers Wives,[1] the Lawyer Placement Service, the commercial sale of the bar's mailing list, and bar activities addressed to influencing legislation.

The hearing on remand shall be concluded not later than July 31, 1981 and the transcript thereof filed with the Clerk of this Court within 60 days after conclusion of the hearing. Thereafter the plaintiff shall file any additional brief he wishes to present for consideration within 30 days of the filing of the transcript and the State Bar shall file any responsive brief within 60 days of the filing of the transcript.

A majority of the Justices are in favor of the action directed by this opinion. All of the Justices agree that, there being a majority for this action, an order to effectuate these directions shall be issued.

---

[1] No further evidence need be taken with regard to the preparation and distribution of the Juror's Manual, the distribution of the "You and the Law" booklet, and funding of the Children's Charter.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.

RYAN, J. The issue in this case is:

To what extent, if any, may this state, through the combined actions of the Supreme Court, the Legislature, and the State Bar, compulsorily exact dues for, and require association in, an integrated bar organization over the First Amendment[1] objections of an affected individual attorney?

We would hold:

The State of Michigan, through the combined actions of the Supreme Court, the Legislature, and the State Bar, may compulsorily exact dues, and require association, to support only those duties and functions of the State Bar which serve a compelling state interest and which cannot be accomplished by means less intrusive upon the First Amendment rights of the objecting individuals affected.

## I. FACTUAL BACKGROUND

### A

This case was commenced as an original proceeding in this Court on November 30, 1977 when plaintiff attorney Allan Falk filed a pleading entitled "Petition for Special Relief" which named the State Bar of Michigan as the defendant.

The plaintiff's petition is a three-page document which sets forth a series of factual allegations and

---

[1] The First Amendment of the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

legal assertions expressing his First Amendment objections to various activities and expenditures of the State Bar of Michigan, to which he must belong and pay dues. While Mr. Falk brings an unusual, and relatively complex, claim to this Court, we find that his petition bears at best only a remote resemblance to a complaint under our court rules, GCR 1963, 101, 111. The petition certainly contains allegations that various activities and expenditures of the State Bar violate the plaintiff's First Amendment rights.[2] However, we are unable to discern the statement of any other claim or cause of action.[3] Further, the demand for

[2] Mr. Falk's petition makes reference to the United States Supreme Court's decision in *Abood v Detroit Board of Education*, 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), *reh den* 433 US 915; 97 S Ct 2989; 53 L Ed 2d 1102 (1977).

[3] Mr. Falk's briefs include discussion and argument relating to a tortious invasion of his privacy which he contends is caused by the State Bar's alleged distribution of its membership lists, with addresses, to various commercial entities for use in mail solicitation efforts.

Mr. Falk's original pleading nowhere states a claim, or requests relief, for tortious invasion of privacy. See GCR 1963, 111.1, 117.2(1). Adequate proofs were not presented to the fact-finder on such a claim. Further, at oral arguments, Mr. Falk acknowledged that he had never requested the State Bar to refrain from so distributing his name and address.

Since we find that no claim was pled for invasion of privacy, no relief requested, and inadequate proofs offered, we will not reach the issue, and we intimate no opinion as to its merit, if any.

Similarly, Mr. Falk's brief discusses an asserted violation of his First Amendment rights to religious freedom under the following heading:

"The use of State Bar dues monies to purchase alcoholic beverages, pork and shellfish for consumption at social functions, particularly when not all State Bar members are invited to such functions or offered alternatives of equal value for dues paid, and which are unnecessary to the accomplishment of any goal central to the viability of the State Bar as a regulatory body, violates the rights of petitioner and other State Bar members under the free exercise and establishment of religion clauses of the First Amendment."

Mr. Falk characterizes the referenced State Bar social functions as "bacchanalian revelries" which are unnecessary to the furtherance of the constitutionally permitted objectives of the State Bar.

Here again, the petition neglects to state any claim, or seek any

judgment or relief (see GCR 1963, 111.1[3]) requests only that the "petition for special relief be granted".[4] We treat the petition as a complaint for a writ of superintending control over the State Bar of Michigan, within our original jurisdiction pursuant to GCR 1963, 851(6); MCL 600.215, 600.219; MSA 27A.215, 27A.219. We further interpret the petition as seeking an order from this Court relieving the plaintiff of the obligation of paying the pro rata portion of his State Bar dues which relates to alleged "unlawful and unconstitutional activities".

Our role under these unusual circumstances is comparable to that of a trial court, responsible for making the appropriate factual determinations

---

relief, for violation of the plaintiff's First Amendment religious freedoms. For that reason, and also because we are satisfied that our disposition of this case renders moot the freedom of religion issues intimated by Mr. Falk, we do not reach the merits of those asserted First Amendment infringements.

[4] Mr. Falk's briefs, but not his petition, also request that all members of the State Bar be notified, through the State Bar Journal, of their right to "opt into" this lawsuit and obtain like relief. The pendency of this action has been reported in the Michigan State Bar Journal. See 57 Mich State Bar J 224-225 (March, 1978). As of the date of the issuance of this opinion, no other member of the State Bar has "opted into" this suit. See GCR 1963, 209.

Mr. Falk, again in his briefs, and not his pleading, further requests that he be granted an attorney's charging lien on all of the dues that might be refunded in this action. It appears from the record that Mr. Falk has been excused of his obligation to pay any bar dues during the pendency of this action. This fact, coupled with the absence of any intervening plaintiffs, combine to result in the generation of no pool of bar dues refunds upon which such a lien could be imposed. Instead, our decision today requires Mr. Falk to pay that portion of his excused bar dues which relates to the constitutional purposes of the bar.

It should also be noted that this action was filed by Mr. Falk solely on his own behalf. He has expressed his belief that a Michigan Court of Appeals decision, *Ball v Detroit*, 84 Mich App 383, 398; 269 NW2d 607 (1978), authoritatively precluded the filing of an original class action in this Court in this case. Because of Mr. Falk's decision to not so proceed, we are not presented with any issue relating to the applicability of the Court of Appeals *Ball* decision in this action, and we therefore intimate no opinion as to the correctness of the plaintiff's understanding of *Ball*.

and applicable conclusions of law in reaching a judgment resolving the claims presented.

Subsequent to the filing of Mr. Falk's petition, this Court entered an order appointing former Judge Maurice E. Schoenberger to conduct a hearing and make findings of fact on the issues presented in this case. 402 Mich 960 (1978).

On June 5 and 6, 1978, the hearing was held, and both parties presented testimony relating to the various activities and functions of the State Bar. A transcript of the hearing is part of the present record. On September 29, 1978 Judge Schoenberger submitted his report to this Court. The report summarizes the presentations of the State Bar and Mr. Falk, lists the exhibits received into evidence at the hearing, and concludes that there are no controverted factual matters which require resolution.

Thereafter, plaintiff Falk filed a brief, a reply brief, and a supplemental reply brief. The defendant State Bar filed a brief in opposition and a motion to file an answer to plaintiff's supplemental reply brief which contained the answering brief. All of this material has been considered by this Court. Finally, pursuant to our order of April 6, 1979 oral arguments were heard on June 5, 1979. 406 Mich 1117 (1979).

A review of the record establishes certain salient facts relating to plaintiff Falk's claim. One of those uncontroverted facts is that the State of Michigan, through the combined actions of this Court, the Legislature, and the State Bar, compels all licensed attorneys to associate in and provide financial support for the integrated State Bar. Another uncontroverted fact is that the State Bar engages in various lobbying efforts in the Legislature, and that such efforts are financed, at least in part, by

the compulsorily exacted dues of the bar's members. It is likewise undisputed that compulsory bar dues are used to finance other activities which plaintiff contends are non-regulatory in nature, such as the Prepaid Legal Services programs, Lawyer Referral Service programs, the Lawyer Placement Service, and the Client Security Fund.

## B

The integrated State Bar of Michigan was legislatively authorized by 1935 PA 58.[5] Thereafter, this Court, in cognizance of the legislation and pursuant to its own inherent power to regulate the practice of law in this state,[6] entered an order

[5] That act provided, in its entirety:

"AN ACT to create the state bar of Michigan; and to authorize the supreme court to provide for the organization, regulation and rules of government thereof.

"*The People of the State of Michigan enact:*

"Sec. 1. There is hereby created an association to be known as the state bar of Michigan, the membership of which shall consist of all persons in the state now or hereafter regularly licensed to practice law in this state.

"Sec. 2. The supreme court is hereby authorized to provide for the organization and regulation of the state bar of Michigan; to provide rules and regulations concerning the conduct and activities of the association and its members; the schedule of membership dues therein, which dues shall not exceed five dollars per annum, nonpayment of which shall be ground for suspension, the ethical standards to be observed in the practice of law, and the discipline, suspension or disbarment of association members. Under such regulations and restrictions as the supreme court may prescribe, the power of subpoena may be conferred upon the association or its officers and committees for the purpose of aiding in the cases of discipline, suspension or disbarment; the rules promulgated by the supreme court and the proceedings and records of the state bar association to be published by the judicial council of Michigan and in the Michigan reports and advance sheets thereof."

See also 1947 PA 34; 1948 CL 601.48, 601.61, 691.51, 691.52; 1961 PA 236, §§ 901, 904; MCL 600.901; MSA 27A.901; MCL 600.904; MSA 27A.904.

[6] See Const 1963, art 6, § 5; *In the Matter of Mills, an Attorney,* 1 Mich 392, 393-394 (1850); *In re Hartford,* 282 Mich 124; 275 NW 791 (1937); *In re Schlossberg v State Bar Grievance Board,* 388 Mich 389, 395; 200 NW2d 219 (1972).

organizing, and promulgating rules concerning, the integrated bar.[7]

Section 1 of the first Supreme Court Rules Concerning the State Bar provided:

"The State bar of Michigan is the association of the members of the bar of this State, organized pursuant to powers of the Supreme Court over the bar of the State. The association shall, under these rules, aid in the promotion of improvements in the administration of justice and the advancement of the science of jurisprudence, in the improvement of the relations between the profession and the public, and in the promotion of the interests of the legal profession in this State."[8]

This original declaration of the purposes of the integrated bar has not been materially altered by any restatement in the subsequent 44 years.[9]

At all times since the formation of our integrated State Bar, all actively practicing lawyers in this state have been required to be members of,[10] and pay dues to,[11] that organization.

---

[7] 273 Mich xxxv (1935).

[8] Id.

[9] See 340 Mich xxxviii (1954) for the text of current State Bar Rule 1.

It is here worthwhile to consider the analysis of the integrated bar's purposes which was expressed by its first president, Roberts P. Hudson, in his "Message from the President" which appeared in 15 Mich State Bar J 7-8 (1936):

"Your organization is designed not only for the benefit and betterment of its members, but primarily for the public at large who require the services of the profession. It must never be subservient to political dictation or intimidation, nor control from outside its membership. It cannot represent the interests of any group or political faith. It must not draw distinctions of color, race or creed. It must not submit to politically minded leadership. It must not stand aloof from its membership. It must purge itself of the unfit. It must not recognize geographic boundaries. It is now and must remain democratic, independent and representative of the best ideals of citizenship."

[10] Supreme Court Rules Concerning the State Bar of Michigan, §§ 2 and 3; now State Bar Rules 2, 3.

[11] Supreme Court Rules Concerning the State Bar of Michigan, § 4; now State Bar Rule 4.

There can be no question that since 1935 the privilege of practicing law in this state has been conditioned upon association with, and financial support of, the integrated State Bar of Michigan compelled by the state.

## II. Relevant United States Supreme Court Decisions

Our analysis of Mr. Falk's claim under the First Amendment is controlled, of course, by the applicable decisions of the United States Supreme Court. We therefore here undertake the task of presenting our understanding of certain United States Supreme Court decisions which are implicated by Mr. Falk's claims and the State Bar's response.

### A. Hanson, Street, and Lathrop

In *Railway Employes' Dep't v Hanson,* 351 US 225; 76 S Ct 714; 100 L Ed 1112 (1956), non-union employees of a railroad brought suit in a Nebraska state court against the railroad and various unions representing the railroad's employees seeking to enjoin anticipated enforcement of a union shop[12] agreement entered into between the railroad and the unions. The contract required that all employ-

[12] A union shop agreement requires that all affected employees must actually join the union, maintain their membership, and pay union dues, as a condition of their employment.

An agency shop agreement is one under which affected employees are not required to actually become members of the union, but are required to pay "service fees" bearing a relationship to union dues to help defray the collective bargaining costs of the agent-union which acts as the exclusive bargaining agent of all affected employees, union members and non-members alike. See, generally, 48 Am Jur 2d, Labor and Labor Relations, §§ 12-20, 355-356, 361; pp 86-93, 273-275, 278-279; 48A Am Jur 2d, *id.,* § 1904, p 324. See also *Abood v Detroit Board of Education, supra,* 431 US 217, fn 10.

ees of the railroad become members of the specified union as a condition of their employment.

The union shop agreement was permissively authorized by the Federal Railway Labor Act. That act authorized union shop agreements "notwithstanding the law of 'any State'". 351 US 228.

The Nebraska state constitution contained a "right to work" provision which outlawed union shop agreements.

The Nebraska trial court enjoined enforcement of the agreement. The Nebraska Supreme Court affirmed, holding that the union shop agreement violated the First Amendment in that it deprived employees of their freedom of association, and violated the Fifth Amendment,[13] in that it required members of the union to pay for activities above and apart from the costs relating to collective bargaining. The Nebraska Supreme Court concluded that the relevant provisions of the Railway Labor Act were unconstitutional under the Federal constitution, and therefore did not supersede the Nebraska state constitution's right to work provision. 160 Neb 669; 71 NW2d 526 (1955).

The United States Supreme Court, in an opinion authored by Justice Douglas, reversed. While the Court's decision in *Hanson* has been accorded varying interpretations in later cases, we believe that *Hanson* narrowly held: (1) that Congress' bare authorization of union shops was within the consti-

[13] US Const, Am V provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

tutional realm of legislative policy making under the Commerce Clause,[14] in pursuit of labor peace; and (2) that the *Hanson* record did not present any concrete, justiciable First Amendment issues relating to the union shop agreement's potential impairment of freedom of expression or forcing of ideological conformity, since the action had been commenced before the effective date of the agreement.[15] 351 US 238.

In *International Ass'n of Machinists v Street,* 367 US 740; 81 S Ct 1784; 6 L Ed 2d 1141 (1961), a union shop agreement entered into under the Railway Labor Act was challenged by objecting railroad employees.

The employees brought an action in a Georgia state court alleging that substantial portions of their compulsory union dues were being used to finance the campaigns of political candidates, and to advance the propagation of political and economic doctrines to which the plaintiffs were opposed. The agreement in *Street* was in effect at the time the action was brought and a concrete record was therefore presented.

The state trial court entered a judgment for the plaintiffs, enjoining enforcement of the agreement to the extent that it permitted the use of dues for political purposes and the propagation of ideologies which the plaintiffs opposed.

The Georgia Supreme Court affirmed. 215 Ga 27; 108 SE2d 796 (1959).

---

[14] US Const, art I, § 8, cl 3.

[15] Of interest in Justice Douglas' *Hanson* opinion is the following statement:

"On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar." 351 US 238.

Justice Douglas later disavowed the analogy. *Lathrop v Donohue,* 367 US 820, 879; 81 S Ct 1826; 6 L Ed 2d 1191 (1961). See also *Abood v Detroit Board of Education, supra,* 431 US 246, fn 1 (Powell, J., concurring).

On appeal, the United States Supreme Court, in an opinion by Justice Brennan signed by four Justices, with two additional Justices concurring in the decisional analysis, reversed and remanded for further proceedings.

Justice Brennan's opinion considered the *Hanson* decision at length. The inadequacy of the *Hanson* record with respect to the justiciability of the possible First Amendment issues was emphasized. *Hanson* was read as only reaching the facial constitutionality of the Railway Labor Act's authorization of union shop agreements:

"In their brief in this Court the appellees in *Hanson* argued that First Amendment rights would be infringed by the enforcement of an agreement which would enable compulsorily collected funds to be used for political purposes. But there was nothing concrete in the record to show the extent to which the unions were actually spending money for political purposes and what these purposes were, nothing to show the extent to which union funds collected from members were being used to meet the costs of political activity and the mechanism by which this was done, and nothing to show that the employees there involved opposed the use of their money for any particular political objective. In contrast, the present record contains detailed information on all these points, and specific findings were made in the courts below as to all of them. When it is recalled that the action in *Hanson* was brought before the union-shop agreement became effective and that the appellees never thereafter showed that the unions were actually engaged in furthering political causes with which they disagreed and that their money would be used to support such activities, it becomes obvious that this Court passed merely on the constitutional validity of § 2, Eleventh of the Railway Labor Act on its face, and not as applied to infringe the particularized constitutional rights of any individual. On such a record, the Court could not have done more, consistently with the re-

straints that govern us in the adjudication of constitutional questions and warn against their premature decision. We therefore reserved decision of the constitutional questions which the appellees present in this case. We said: "It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record * * * if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. For we pass narrowly on § 2, Eleventh of the Railway Labor Act. *We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments." Id.* 351 US 238. See, also, 351 US 242 (concurring opinion). *Thus all that was held in Hanson was that § 2, Eleventh was constitutional in its bare authorization of union-shop contracts requiring workers to give 'financial support' to unions legally authorized to act as their collective bargaining agents.* We sustained this requirement—and only this requirement—embodied in the statutory authorization of agreements under which 'all employees shall become members of the labor organization representing their craft or class.' *Clearly we passed neither upon forced association in any other aspect nor upon the issue of the use of exacted money for political causes which were opposed by the employees."* (Footnote omitted, emphasis supplied.) 367 US 747-749.

Finding the *Street* record sufficiently concrete to present the issues not decided in *Hanson,* the Court went through an exhaustive analysis of the legislative histories of various Federal railroad labor acts, and then delivered the following construction of the Railway Labor Act's union shop provision:

"We give § 2, Eleventh the construction which achieves both congressional purposes when we hold, as we do, that § 2, Eleventh is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes.

"We express no view as to other union expenditures objected to by an employee and not made to meet the costs of negotiation and administration of collective agreements, or the adjustment and settlement of grievances and disputes. We do not understand, in view of the findings of the Georgia courts and the question decided by the Georgia Supreme Court, that there is before us the matter of expenditures for activities in the area between the costs which led directly to the complaint as to 'free riders,' and the expenditures to support union political activities. We are satisfied, however, that § 2, Eleventh is to be interpreted to deny the unions the power claimed in this case. The appellant unions, in insisting that § 2, Eleventh contemplates their use of exacted funds to support political causes objected to by the employee, would have us hold that Congress sanctioned an expansion of historical practices in the political area by the rail unions. This we decline to do. Both by tradition and, from 1934 to 1951, by force of law, the rail unions did not rely upon the compulsion of union security agreements to exact money to support the political activities in which they engage. Our construction therefore involves no curtailment of the traditional political activities of the railroad unions. It means only that those unions must not support those activities, against the expressed wishes of a dissenting employee, with his exacted money." (Footnotes omitted.) 367 US 768-770.

The *Street* opinion emphasized that the objecting employees' cause of action arose under the Railway Labor Act, and not the First Amendment, because the exactions complained of were not authorized by that statute. 367 US 771.

The foregoing interpretations of *Hanson* and

*Street* clearly indicate that neither case was decided on First Amendment grounds, although the delimiting language of that provision arguably implicitly compelled the results reached.

In *Lathrop v Donohue,* 367 US 820; 81 S Ct 1826; 6 L Ed 2d 1191 (1961), a companion case to *Street,* Wisconsin attorney Lathrop brought an action in a state trial court to recover compulsorily exacted dues paid by him to the integrated Wisconsin State Bar, alleging the requirement to pay such dues to be unconstitutional under the First and Fourteenth Amendments[16] of the United States Constitution. The treasurer of the Wisconsin State Bar was named as the defendant.

The defendant demurred to the complaint on three grounds, one of which was that the complaint did not state facts sufficient to constitute a cause of action. The trial court sustained the demurrer on all three grounds, and then entered an order dismissing the complaint without leave to amend, for the reason that no amendment could cure the defects in the merits of the plaintiff's case. See 367 US 868-869 (Black, J., dissenting).

On appeal to the Wisconsin Supreme Court, the judgment of the trial court was affirmed. 10 Wis 2d 230; 102 NW2d 404 (1960). The Court held that the trial court was without subject matter jurisdiction to entertain the plaintiff's complaint, but went on to treat the complaint as if it had been originally filed in the reviewing court.

---

[16] Section 1 of the Fourteenth Amendment of the United States Constitution provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

We read the Wisconsin Supreme Court's opinion as determining that the state had a sufficient interest in the achievement of the stated objectives of the integrated bar to justify the minimal compulsion of individuals effected by the requirement of association in, and payment of dues to, the integrated Wisconsin bar.

The United States Supreme Court, on appeal, divided sharply and entered a plurality judgment affirming the Wisconsin Supreme Court. That affirmance was later explained in *Abood v Detroit Board of Education,* 431 US 209, 233, fn 29; 97 S Ct 1782; 52 L Ed 2d 261 (1977), as follows:

"In *Lathrop v Donohue,* 367 US 820, a companion case to *Street,* a lawyer sued for the refund of dues paid (under protest) to the integrated Wisconsin State Bar. The dues were required as a condition of practicing law in Wisconsin. The plaintiff contended that the requirement violated his constitutionally protected freedom of association because the dues were used by the State Bar to formulate and to support legislative proposals concerning the legal profession to which the plaintiff objected.

"A plurality of four Justices found that the requirement was not on its face unconstitutional, relying on the analogy to *Hanson.* And the plurality ruled, as had the Court in *Hanson,* that the constitutional questions tendered were not ripe, for the Court was nowhere 'clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities.' 367 US at 845-846. The other five Members of the Court disagreed with the plurality and thought that the constitutional questions ought to be reached. Three Justices would have upheld the constitutionality of using compulsory dues to finance the State Bar's legislative activities even where opposed by dissenting members. See *id.,* at 848 (Harlan, J., concurring in

judgment); *id.,* at 865 (Whittaker, J., concurring in
result). The other two Justices would have held such
activities to be unconstitutional. See *ibid.* (Black, J.,
dissenting); *id.,* at 877 (Douglas, J., dissenting).

"The only proposition about which a majority of the
Court in *Lathrop* agreed was that the constitutional
issues should be reached. However, due to the disparate
views of those five Justices on the merits and the
failure of the other four Members of the Court to
discuss the constitutional questions, *Lathrop* does not
provide a clear holding to guide us in adjudicating the
constitutional questions here presented."

It is clear from the foregoing that the United
States Supreme Court did not resolve the merits of
the constitutional issues raised by the plaintiff's
arguments in *Lathrop.*

Although none of the three decisions discussed
above was decided on First Amendment grounds,
some analysis of them is necessary in order to
fully understand the *Abood* decision, upon which
Mr. Falk places considerable reliance.

### B. Abood

In *Abood v Detroit Board of Education, supra,*
the defendant board entered into a collective bar-
gaining agreement with the Detroit Federation of
Teachers, the certified exclusive representative of
teachers employed by the board. The agreement
implemented an agency shop[17] arrangement
whereby all board-employed teachers were re-
quired to pay a service fee to the union as a
condition of their employment, although they were
not required to actually join the union.

Certain objecting teachers filed an action against
the board, the union, and others, in circuit court

[17] See fn 12, *supra.*

alleging that the agency shop contract violated their First Amendment rights, in that the plaintiffs were opposed to collective bargaining in the public sector generally; and that the union was using the agency service fees to support ideological and political causes which were unrelated to collective bargaining activities and which were opposed by the plaintiffs.

The circuit court granted the defendants' motion for summary judgment,[18] finding the agency shop arrangement inoffensive to the plaintiffs' constitutional rights.

During the pendency of the plaintiffs' subsequent appeal from the summary judgment, this Court decided *Smigel v Southgate Community School Dist,* 388 Mich 531; 202 NW2d 305 (1972), which held that the Michigan public employment relations act (PERA), as then written, did not authorize or permit agency shop contracts in the public employment sphere.

The *Abood* application for leave to appeal then reached this Court. On the authority of *Smigel* the circuit court's summary judgment was vacated and the case was remanded to that court "for further proceedings consonant herewith", *sub nom Warczak v Detroit Board of Education,* 389 Mich 755 (1972).

The Legislature then amended PERA to expressly authorize agency shop contracts in the public sector. 1973 PA 25; MCL 423.210(1); MSA 17.455(10)(1).

On remand to the circuit court, the defendants filed a new motion for summary judgment based on the premise that the PERA amendment autho-

---

[18] The motion was brought pursuant to GCR 1963, 117.2(1), on the ground that the opposing party had failed to state a claim upon which relief could be granted.

rizing agency shops should be given retroactive effect (thereby effectively reversing *Smigel)*. The circuit court granted the new summary judgment motion.

On appeal to the Michigan Court of Appeals, the trial court was reversed. *Abood v Detroit Board of Education,* 60 Mich App 92; 230 NW2d 322 (1975). The Court of Appeals held that the legislative amendment to PERA concerning agency shop agreements was prospective only. This holding would have been dispositive of the *Abood* case, since *Abood* involved a pre-PERA amendment agency shop agreement.[19]

However, the Court of Appeals went on to frame the following issue at 60 Mich App 98:

"Does the agency shop clause violate plaintiffs' First and Fourteenth Amendment rights securing freedom of speech and freedom of association?"

The Court of Appeals then discussed the United States Supreme Court's decisions in *Hanson* and *Street* and concluded:

"We have before us then, two powerful countervailing public policies. We are asked, on the one hand, to preserve freedom of expression, and, on the other, to promote labor stability. But freedom of expression is a constitutional right so basic to our form of government that it must be jealously guarded. This is particularly true where, as here, employees are compelled by the government to support the collective bargaining activities of an organization which they prefer not to join. Justice Douglas expressed this concern well in his concurring opinion in *Street:*

" 'If an association is compelled, the individual should

[19] See the United States Supreme Court's analysis on this point in *Abood v Detroit Board of Education,* 431 US 209, 216, fn 9; 97 S Ct 1782; 52 L Ed 2d 261 (1977).

not be forced to surrender any matters of conscience, belief, or expression. He should be allowed to enter the group with his own flag flying, whether it be religious, political, or philosophical; nothing that the group does should deprive him of the privilege of preserving and expressing his agreement, disagreement, or dissent, whether it coincides with the view of the group, or conflicts with it in minor or major ways; and he should not be required to finance the promotion of causes with which he disagrees.' 367 US at 776 * * *.

"Therefore, we conclude that the agency shop clause, as prospectively authorized by the amendment to MCL 423.210; MSA 17.455(10), could violate plaintiffs' First and Fourteenth Amendment rights." 60 Mich App 100.

The record presented was, however, found to be inadequate to merit relief:

"To reiterate briefly, employees who are forced to contribute service fees to a collective bargaining representative may not be deprived of First Amendment freedom of expression. But, in order to preserve this right, the employee must make known to the union those causes and candidates to which he objects. The remedy then would be restitution to the employee of that portion of his money expended by the union over his objection." 60 Mich App 102.

This Court subsequently denied leave to appeal from the Court of Appeals decision. 395 Mich 755-756 (1975).

On appeal to the United States Supreme Court, the judgment of the Michigan Court of Appeals was vacated and the case was remanded to the trial court for further proceedings.

The majority opinion framed the following issue:

"The issue before us is whether [the agency shop] arrangement violates the constitutional rights of government employees who object to public-sector unions

as such or to various union activities financed by the compulsory service fees." *Abood v Detroit Board of Education,* 431 US 209, 211.

The majority observed that "[t]o compel employees financially to support their collective-bargaining representative has an impact on their First Amendment interests", 431 US 222, and then considered the applicability of *Hanson* and *Street* to the *Abood* facts:

"The distinctive nature of public-sector bargaining has led to widespread discussion about the extent to which the law governing labor relations in the private sector provides an appropriate model. To take but one example, there has been considerable debate about the desirability of prohibiting public employee unions from striking, a step that the State of Michigan itself has taken [MCL 423.202]. But although Michigan has not adopted the federal model of labor relations in every respect, it has determined that labor stability will be served by a system of exclusive representation and the permissive use of an agency shop in public employment. As already stated, there can be no principled basis for according that decision less weight in the constitutional balance than was given in *Hanson* to the congressional judgment reflected in the Railway Labor Act. The only remaining constitutional inquiry evoked by the appellants' argument, therefore, is whether a public employee has a weightier First Amendment interest than a private employee in not being compelled to contribute to the costs of exclusive union representation. We think he does not." (Footnotes omitted.) 431 US 229.

Shortly thereafter the Court said:

"The differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights. Even those commentators most acutely aware of the distinctive nature of public-sector bargaining and most seriously concerned

with its policy implications agree that '[t]he union security issue in the public sector * * * is fundamentally the same issue * * * as in the private sector * * *. No special dimension results from the fact that a union represents public rather than private employees.' Wellington & Winter, The Unions and the Cities (1971), pp 95-96. We conclude that the Michigan Court of Appeals was correct in viewing this Court's decisions in *Hanson* and *Street* as controlling in the present case insofar as the service charges are applied to collective-bargaining, contract administration, and grievance-adjustment purposes." 431 US 232.

After the Court determined that the *Abood* record did not permit avoidance of the First Amendment issues raised, the following analysis and conclusion were stated:

"Our decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. *E.g., Elrod v Burns,* 427 US 347, 355-357 [96 S Ct 2673; 49 L Ed 2d 547 (1976)] (plurality opinion); *Cousins v Wigoda,* 419 US 477, 487 [95 S Ct 541; 42 L Ed 2d 595 (1975)]; *Kusper v Pontikes,* 414 US 51, 56-57 [94 S Ct 303; 38 L Ed 2d 260 (1973)]; *NAACP v Alabama ex rel Patterson,* 357 US 449, 460-461 [78 S Ct 1163; 2 L Ed 2d 1488 (1958)]. Equally clear is the proposition that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment. *E.g., Elrod v Burns, supra,* at 357-360, and cases cited; *Perry v Sindermann,* 408 US 593 [92 S Ct 2694; 33 L Ed 2d 570 (1972)]; *Keyishian v Board of Regents,* 385 US 589 [87 S Ct 675; 17 L Ed 2d 629 (1967)]. The appellants argue that they fall within the protection of these cases because they have been prohibited, not from actively associating, but rather from refusing to associate. They specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unre-

lated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one.

"One of the principles underlying the Court's decision in *Buckley v Valeo,* 424 US 1 [96 S Ct 612; 46 L Ed 2d 659 (1976)], was that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. Because '[m]aking a contribution * * * enables like-minded persons to pool their resources in furtherance of common political goals,' *id.,* at 22, the Court reasoned that limitations upon the freedom to contribute 'implicate fundamental First Amendment interests,' *id.,* at 23.

"The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. See *Elrod v Burns, supra,* at 356-357; *Stanley v Georgia,* 394 US 557, 565 [89 S Ct 1243; 22 L Ed 2d 541 (1969)]; *Cantwell v Connecticut,* 310 US 296, 303-304 [60 S Ct 900; 84 L Ed 1213; 128 ALR 1352 (1940)]. And the freedom of belief is no incidental or secondary aspect of the First Amendment's protections:

"'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' *West Virginia Bd of Ed v Barnette,* 319 US 624, 642 [63 S Ct 1178; 87 L Ed 1628; 147 ALR 674 (1943)].

"These principles prohibit a State from compelling any individual to affirm his belief in God, *Torcaso v Watkins,* 367 US 488 [81 S Ct 1680; 6 L Ed 2d 982 (1961)], or to associate with a political party, *Elrod v Burns, supra;* see 427 US, 363-364, fn 17, as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may

oppose as a condition of holding a job as a public school teacher." (Footnotes omitted.) 431 US 233-235.

With reference to the issue framed by the United States Supreme Court, p 101, *supra,* we read *Abood* as holding: (1) that, as in *Hanson,* the State of Michigan's authorization of agency shop agreements in the public sector served a sufficiently compelling state interest in the achievement of labor stability to permit impingement on public employees' First Amendment rights to the extent of requiring payment of service fees for purposes germane to the collective bargaining duties of the teachers' union; and (2) that to the extent that agency fees were exacted and used for purposes beyond or apart from those activities related to collective bargaining, the plaintiffs had stated a claim upon which relief could be granted under the First Amendment.[20]

---

[20] The Court drew no lines between the permissible and the impermissible, 431 US 236, and further clarified the context in which its decision was made:

"All that we decide is that the general allegations in the complaints, if proved, establish a cause of action under the First and Fourteenth Amendments." 431 US 237.

This language suggests that as to the compulsion of service fees for activities relating to collective bargaining, the complaints in *Abood* failed to state a claim upon which relief could be granted under the First and Fourteenth Amendments. As to the compulsion of service fees for other purposes, the plaintiffs' complaint did state a claim, and further proceedings going to the proof of that claim were required before a delineation of what activities were constitutionally permissible could be made. Established First Amendment principles indicate that, once an individual has stated a valid claim under the First Amendment, the burden of proof shifts to the state to show the infringement on individual rights that is claimed is unavoidable in order to accomplish a compelling state interest. See, *e.g., Elrod v Burns,* 427 US 347, 363; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (Brennan, J., plurality opinion).

As previously stated, in the present case, this Court sits, under these unusual circumstances, as the trial court. Indeed, our order appointing a fact-finder for the purpose of conducting a hearing on the factual matters here involved necessarily implicitly recognized that Mr. Falk's pleading stated a claim in First Amendment terms which

With the foregoing understanding of *Abood* and its progenitors in mind, we now proceed to our analysis of the present case.

## III. Analysis

### A. Controlling Principles

While the decision in *Abood* is of primary significance to the instant case, it does not offer a clear statement of the controlling framework for analysis of First Amendment issues of the kind here presented. We therefore turn to the earlier United States Supreme Court decision in *Elrod v Burns,* 427 US 347; 96 S Ct 2673; 49 L Ed 2d 547 (1976), which does.

In *Elrod,* non-civil service employees of the Cook County, Illinois, Sheriff's Department challenged the constitutionality of the longstanding patronage system in that county. Under that system, employees were required to become affiliated with or sponsored by the political party in control of the office of Sheriff, or face the likelihood of being discharged.

Justice Brennan's lead opinion in the plurality decision neatly summarized the controlling First Amendment principles:

"Although the practice of patronage dismissals clearly infringes First Amendment interests, our inquiry is not at an end, for the prohibition on encroachment of First Amendment protections is not an absolute. Restraints are permitted for appropriate reasons. *Keyishian* and *Perry,* however, not only serve to establish a presumptive prohibition on infringement, but also serve to dispose of one suggested by petitioners' reference to this Court's affirmance by an equally di-

required development of an appropriate factual record. See 402 Mich 960 (1978).

vided court in *Bailey v Richardson,* 341 US 918 [71 S Ct
669; 95 L Ed 1352] (1951), *aff'g* 86 US App DC 248; 182
F2d 46 (1950). That is the notion that because there is
no right to a government benefit, such as public em-
ployment, the benefit may be denied for any reason.
*Perry,* however, emphasized that '[f]or at least a quar-
ter-century, this Court has made clear that even though
a person has no "right" to a valuable governmental
benefit and even though the government may deny him
the benefit for any number of reasons, there are some
reasons upon which the government may not rely.' 408
US, at 597. *Perry* and *Keyishian* properly recognize one
such impermissible reason: The denial of a public ben-
efit may not be used by the government for the purpose
of creating an incentive enabling it to achieve what it
may not command directly. ' "[T]he theory that public
employment which may be denied altogether may be
subjected to any conditions, regardless of how unreason-
able, has been uniformly rejected." ' *Keyishian v Board
of Regents,* 385 US, at 605-606. 'It is too late in the day
to doubt that the liberties of religion and expression
may be infringed by the denial of or placing of condi-
tions upon a benefit or privilege.' *Sherbert v Verner,*
374 US 398, 404 [83 S Ct 1790; 10 L Ed 2d 965] (1963).
' "[T]his Court now has rejected the concept that consti-
tutional rights turn upon whether a governmental ben-
efit is characterized as a 'right' or as a 'privilege'." '
*Sugarman v Dougall,* 413 US 634, 644 [93 S Ct 2842; 37
L Ed 2d 853 (1973)] (quoting *Graham v Richardson,* 403
US 365, 374 [91 S Ct 1848; 29 L Ed 2d 534 (1971)]).

"While the right-privilege distinction furnishes no
ground on which to justify patronage, petitioners raise
several other justifications requiring consideration. Be-
fore examining those justifications, however, it is neces-
sary to have in mind the standards according to which
their sufficiency is to be measured. It is firmly estab-
lished that a significant impairment of First Amend-
ment rights must survive exacting scrutiny. *Buckley v
Valeo,* 424 US, at 64-65; *NAACP v Alabama [ex rel
Patterson],* 357 US [449, 460-461; 78 S Ct 1163; 2 L Ed
2d 1488 (1958)]. 'This type of scrutiny is necessary even
if any deterrent effect on the exercise of First Amend-
ment rights arises, not through direct government ac-

tion, but indirectly as an unintended but inevitable result of the government's conduct. * * *' *Buckley v Valeo, supra,* at 65. Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.' *Kusper v Pontikes,* 414 US, at 58. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. *Buckley v Valeo, supra,* at 94; *Williams v Rhodes,* 393 US [23, 31-33; 89 S Ct 5; 21 L Ed 2d 24 (1968)]; *NAACP v Button,* 371 US 415, 438, 444 [83 S Ct 328; 9 L Ed 2d 405 (1963)]; *Bates v Little Rock,* 361 US 516, 524 [80 S Ct 412; 4 L Ed 2d 480 (1960)]; *NAACP v Alabama [ex rel Patterson], supra,* 464-466; *Thomas v Collins,* 323 US 516, 530 [65 S Ct 315; 89 L Ed 430 (1945)]. In the instant case, care must be taken not to confuse the interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. *Sherbert v Verner, supra,* [374 US] at 406. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, see *United Public Workers v Mitchell,* 330 US [75, 96; 67 S Ct 556; 91 L Ed 754 (1947)], and the government must 'emplo[y] means closely drawn to avoid unnecessary abridgment. * * *' *Buckley v Valeo, supra,* at 25. '[A] State may not choose means that unnecessarily restrict constitutionally protected liberty. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.' *Kusper v Pontikes, supra,* at 59 (citations omitted). See *United States v Robel,* 389 US 258 [88 S Ct 419; 19 L Ed 2d 508 (1967)]; *Shelton v Tucker,* 364 US 479 [81 S Ct 247; 5 L Ed 2d 231 (1960)]. In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss

of constitutionally protected rights." (Footnotes omit-
ted.) *Elrod v Burns,* 427 US 360-363. See, also, *Abood v
Detroit Board of Education,* 431 US 259-261 (Powell, J.,
concurring in judgment).

As the above quoted passage states, First
Amendment protections are not absolute. The com-
pelling interests of government may justify restric-
tions on the First Amendment freedoms of individ-
uals.

It remains to be determined how, if at all, the
arguments of the parties before us are to be re-
solved by application of the above-stated constitu-
tional principles.

## B. Arguments

The essence of Mr. Falk's First Amendment
argument is that *Abood* mandates a ruling in this
case that he cannot be compelled to pay dues
which are used for non-regulatory activities of the
State Bar, particularly lobbying and other political
activities.

The State Bar responds that *Abood* is foremost a
labor law case, and is not applicable in the present
action. The State Bar is not a labor organization,
but is rather a "public body corporate" that oper-
ates as a public or state agency. Further, the State
Bar argues that the grant of permission to practice
law is a privilege and not a right. The state may
burden this privilege with conditions. Finally, the
State Bar contends that assuming *arguendo* the
applicability of *Abood* here, all that case requires
is that dues be "imposed for purposes germane to
the organization and existence of the State Bar",
which includes those purposes stated in State Bar
Rule 1.

As shall be hereinafter developed, we find the

plaintiff's arguments and authorities to be the more convincing.

## C. Holding

Certainly *Abood* and the case before us can be distinguished. However, neutral analysis reveals that the factual differences in the two cases lead to the conclusion that the First Amendment principles announced and applied to the facts in *Abood* impact with even greater force upon the present case.

In *Abood,* the United States Supreme Court found certain attributes of an agency shop agreement, permissively authorized by state law, potentially violative of the objecting teachers' First Amendment rights. While all teachers must be state-certified in Michigan,[21] they are not required to join any state-controlled organization. Indeed, the teachers in *Abood* could have avoided the violation of their First Amendment rights by seeking employment with an unorganized Michigan school district, or with unorganized private or parochial Michigan schools. While the state had authorized school districts and teacher organizations to voluntarily enter agency shop contracts, the state has never required individual teachers to associate with and pay dues to a teacher's association as a condition of obtaining and maintaining certification as a teacher in Michigan.

On the other hand, we are here concerned with the propriety of state-compelled association in, and financial support of, a "public body corporate" as a condition precedent to the pursuit of one's liveli-

[21] See MCL 380.1531 *et seq.;* MSA 15.41531 *et seq.;* MCL 388.551, 388.553; MSA 15.1921, 15.1923.

hood as an attorney in this state, in any active legal capacity. No alternatives, even unpalatable ones, exist for the objecting individual attorney.

Mr. Falk's petition does not specify which of his First Amendment rights are offended. However, we are satisfied that his pleading raises issues involving his rights to freedom of association[22] and freedom of belief.[23] The State of Michigan's requirement of association with, and financial support of, the integrated State Bar clearly has a significant impact on these rights. See *Abood v Detroit Board of Education,* 431 US 222.

First Amendment guarantees are made applicable to the several states through the Due Process Clause of the Fourteenth Amendment. See *Gitlow v New York,* 268 US 652, 666; 45 S Ct 625; 69 L Ed 1138 (1925); *De Jonge v Oregon,* 299 US 353, 364-365; 57 S Ct 255; 81 L Ed 278 (1937). It is well established that state action which infringes on First Amendment rights can only be tolerated where such infringement is unavoidably required in order to further a "compelling",[24] "para-

---

[22] See *Abood v Detroit Board of Education,* fn 2 *supra,* 431 US 233; *Cousins v Wigoda,* 419 US 477, 487; 95 S Ct 541; 42 L Ed 2d 595 (1975); *Kusper v Pontikes,* 414 US 51, 56-57; 94 S Ct 303; 38 L Ed 2d 260 (1973).

[23] See *Abood v Detroit Board of Education,* fn 2 *supra,* 431 US 234-235; *Stanley v Georgia,* 394 US 557, 565; 89 S Ct 1243; 22 L Ed 2d 542 (1969); *Cantwell v Connecticut,* 310 US 296, 303-304; 60 S Ct 900; 84 L Ed 1213; 128 ALR 1352 (1940); *Wooley v Maynard,* 430 US 705, 714-715; 97 S Ct 1428; 51 L Ed 2d 752 (1977). See also *Elrod v Burns,* 427 US 347, 355-356; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (Brennan, J., plurality opinion).

[24] See *Bates v Little Rock,* 361 US 516, 524; 80 S Ct 412; 4 L Ed 2d 480 (1960); *NAACP v Button,* 371 US 415, 438-439; 83 S Ct 328; 9 L Ed 2d 405 (1963); *Williams v Rhodes,* 393 US 23, 30-32; 89 S Ct 5; 21 L Ed 2d 24 (1968); *Storer v Brown,* 415 US 724, 729; 94 S Ct 1274; 39 L Ed 2d 714 (1974); *American Party of Texas v White,* 415 US 767, 780; 94 S Ct 1296; 39 L Ed 2d 744 (1974); *Wooley v Maynard,* 430 US 705, 715-716; 97 S Ct 1428; 51 L Ed 2d 752 (1977). See also *Ohralik v Ohio State Bar Ass'n,* 436 US 447, 462; 98 S Ct 1912; 56 L Ed 2d 444 (1978).

mount",[25] or "vital"[26] state interest. Unquestionably, the state has very strong, even compelling, interests in the regulation of, and maintenance of high standards in, the legal profession, "since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts' ". See *Ohralik v Ohio State Bar Ass'n,* 436 US 447, 460; 98 S Ct 1912; 56 L Ed 2d 417 (1978) (citation omitted). Nonetheless, and although the permission to practice law may rightly be regarded as a privilege, the state's intrusion on First Amendment rights of all individuals, including attorneys, must be consciously and scrupulously minimized.

We therefore conclude that, in light of the controlling First Amendment principles as hereinabove discussed, the State of Michigan, through the combined actions of this Court, the Legislature, and the State Bar, may compulsorily exact dues, and require association, to support only those duties and functions of the State Bar which serve compelling state interests and which cannot be accomplished by means less intrusive upon the First Amendment rights of objecting individual attorneys. See *Abood v Detroit Board of Education, supra; Elrod v Burns, supra,* at 360-363 (Brennan, J., plurality opinion); see also cases cited in fns 24, 25 and 26.

IV. FINDINGS, CONCLUSIONS, AND RELIEF

Having considered the pleadings, the briefs, the oral arguments of the parties, the report of the

---

[25] See *Elrod v Burns,* 427 US 347, 362; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (Brennan, J., plurality opinion).

[26] *American Party of Texas v White,* fn 24 *supra,* 415 US 780-781. See also *Elrod v Burns,* fn 25 *supra,* 427 US 360-363; *Buckley v Valeo,* 424 US 1, 93-94; 96 S Ct 612; 46 L Ed 2d 659 (1976).

fact-finder, and other relevant material and authorities, we make the following findings of fact and conclusions of law:[27]

1. That the original pleading in this action, entitled "Petition for Special Relief", is in the nature of a complaint for a writ of superintending control, and is within this Court's original jurisdiction pursuant to GCR 1963, 851(6); MCL 600.215, 600.219; MSA 27A.215, 27A.219;

2. That plaintiff Allan Falk is, and has been, like all active attorneys in this state, required as a matter of law to be a member of the State Bar of Michigan and is, and has been, required to pay dues in support of that organization;

3. That Mr. Falk has been excused of the obligation to pay any dues to the State Bar of Michigan during the pendency of this action;

4. That the State Bar of Michigan engages in many activities which the plaintiff's dues have been, and would now be, used to support, and with which the plaintiff must associate by virtue of his compulsory membership in the State Bar;

5. That Mr. Falk's Petition for Special Relief and his briefs in support thereof express his objec-

---

[27] As previously indicated, fn 4 *supra,* no other member of the State Bar has sought to intervene in this case, although pendency of this action was reported in the Michigan State Bar Journal. See 57 Mich State Bar J 224-225 (March, 1978).

We realize that, to the extent that this decision has retroactive application, restitution of improperly used bar dues would be the appropriate equitable remedy. However, we are equally aware of the pertinence here of the maxim of equity that "equity aids the vigilant, not those who sleep on their rights". See *Zoellner v Zoellner,* 46 Mich 511, 515; 9 NW 831 (1881); *Douglass v Douglass,* 72 Mich 86, 98-99; 40 NW 177 (1888); *Henderson v Connolly's Estate,* 294 Mich 1, 18-20; 292 NW 543 (1940); *Gustin v Alpena Power Co,* 307 Mich 241, 244; 11 NW2d 873 (1943). We find this principle particularly forceful in the present circumstances, since the group of persons affected by this decision is composed of trained and qualified lawyers, presumably well-informed on such matters, and certainly on notice as to the pendency of this action.

tions, on First Amendment grounds and otherwise, to various activities of the State Bar of Michigan, and that such petition states a claim upon which relief can be granted under the First Amendment;

6. That the controlling United States Supreme Court decisions relevant to Mr. Falk's claim mandate that the State of Michigan, through its various branches of government and its agencies, cannot require association with, or payment of dues in support of, the State Bar of Michigan for other than those duties and functions of the State Bar which serve compelling state interests and which cannot be achieved by means less intrusive upon the First Amendment rights of objecting attorneys;

7. That under the controlling United States constitutional principles, once an individual has stated a claim upon which relief can be granted under the First Amendment, the burden is on the state or its agency to show the existence of a compelling interest which cannot be achieved with less intrusion upon the affected individual's First Amendment rights;

8. That the regulation of the practice of law, the maintenance of high standards in the legal profession, and the discharge of the profession's duty to protect and inform the public are, in the context of the present challenge, purposes in which the State of Michigan has a compelling interest which will justify unavoidable intrusions on the First Amendment rights of objecting attorneys;

9. That the record in this case establishes that the defendant State Bar of Michigan has shown a compelling state interest in the following functions of the State Bar, and that such functions cannot be accomplished by means less intrusive on the First Amendment rights of an objecting attorney:

A. All regulatory activities, including attorney

disciplinary proceedings as provided in GCR 1963, 950 *et seq.,* to the extent that such activities are funded out of compulsorily exacted State Bar dues; all licensing-related activities such as those provided for in State Bar Rule 15;

B. All continuing legal education activities presently engaged in by the State Bar which are directed to the maintenance of high professional standards among Michigan attorneys;

C. The publication of the Michigan Bar Journal insofar as that publication is primarily devoted to informing the members of the State Bar on current matters relating to regulation of the profession and the improvement of professional standards;

D. The Client Security Fund insofar as it represents a discharge of a duty to protect the public from recreant members of the profession. The cost of this fund is properly distributed among all members of the profession regardless of individual predilections toward or opportunity for wrongdoing. Support of the Client Security Fund is but a logical and necessary extension of our admittedly imperfect regulatory and licensing standards and is a duty necessarily imposed on a profession committed to the public interest;

E. Those activities designed to educate the general public concerning the use of legal services and the relationship between individuals and the legal system generally. This should not be read to include those outreach programs designed to educate the public concerning specific legislation or promoting specific viewpoints. Permissible activities in this area include the publication and distribution of such booklets as "You and the Law", and the "Juror's Manual";

F. Activities designed to make legal services

more accessible, including the Lawyer Referral Service and support for those legal aid organizations serving the indigent. These activities represent a part of the service every attorney owes the public and hence compelling support for them cannot be deemed constitutionally obnoxious.

10. That the political and legislative activities of the bar, which constitute a function wholly separable from its other activities, violate petitioner Falk's First Amendment rights of association and expression.

The record clearly discloses the extent of the State Bar's legislative and lobbying activities. These include but are not limited to: rendering technical advice to the Legislature; testifying before the State Officers Compensation Commission; adopting and publishing official positions on proposed legislation; and retaining a professional lobbyist. To the extent these efforts are funded by mandatory dues, the State Bar impermissibly infringes on the First Amendment freedoms of its individual members.

The ultimate objective of these political and legislative activities is to influence public decision-making. Even if specific legislative-political goals can be justified as advancing the public interest or improving the administration of justice, compelled support and association to further these activities is not constitutionally acceptable. The "public interest" and the "advancement of jurisprudence" are not unitary concepts subject to a single interpretation. Disagreements regarding legislative or other policy choices arise not only because they result in differing practical effects on individuals, but more importantly because they reflect differing ideological approaches to the subject matter. Such ideological beliefs, and association to promote or

oppose such beliefs, lie at "the core of those activities protected by the First Amendment". *Elrod v Burns, supra,* 356.

That petitioner Falk is entitled to express his disagreement within the organizational framework does not wholly diminish the fact that he is being forced to associate for purposes contrary to his beliefs. The focus is not upon freedom of expression within the organization, but rather upon whether the state can justify the forced association in the first instance.

We do not believe that for First Amendment purposes a distinction can be drawn between legislation aimed at issues loosely termed procedural, such as court reorganization and rules of evidence in product liability actions and the like, and those termed substantive. In either category of legislation, the choice of one approach over another is necessarily premise-based and thus subject to contrary opinion or belief. Compelling a dissenter to finance the encouragement of such First Amendment related legislation and associate with its advancement, whether or not he or she opposes it, cannot be justified in the absence of an overriding state need and then only by means narrowly drawn.

In light of alternative methods available to the Legislature to obtain expert legal advice as to both "substantive" and "procedural" legislation, we see no compelling interest to justify the State Bar's legislative activities supported by compulsory dues. Specifically, the Legislature possesses subpoena power, MCL 4.101; MSA 2.181, and has access to the Legislative Service Bureau, the Attorney General, and House and Senate counsel, as well as committee counsel. Additionally, there are a number of voluntary and self-supporting sections

within the State Bar from whom the Legislature can seek input on legal questions. Further, while they cannot be compelled to do so, individual members may be given the opportunity and may choose to voluntarily support legislative and lobbying activities undertaken by the State Bar.

11. That similarly the broad category of State Bar activities designed to further the commercial and economic interests of the members cannot survive First Amendment scrutiny. Unlike the union members in *Abood,* attorneys cannot be categorized as a group with homogeneous economic interests. In fact, the economic interests of different attorneys often are in direct conflict. Such conflicts, and the requirement that members contribute to an association which may, therefore, undercut their self-interests, cannot be brushed aside as something that will be ameliorated by the "democratic process" within the bar. Further, and more important, furtherance of the commercial interests of attorneys, just as those of doctors or accountants, can hardly be found to constitute a compelling governmental interest. Since the end itself cannot be justified, the means designed to serve that end, such as the Lawyer Placement Service, must fall in the face of a First Amendment challenge.

12. That as to all other State Bar of Michigan activities, the present record fails to demonstrate a compelling state interest which cannot be served by means less intrusive on the First Amendment rights of an objecting individual attorney.

However, apart from those permissible activities discussed in paragraph 9, the State Bar's legislative and lobbying activities, and those activities solely designed to further the commercial interests of its membership, we acknowledge that determi-

nation of the state interest in the remainder of the challenged State Bar activities and whether that interest, if compelling, is served by narrowly drawn means is made difficult, indeed impossible, by a most inadequate record.

Consequently, we would order:

A. That the State Bar of Michigan be enjoined from disbursing compulsorily exacted dues for any functions or purposes other than those described in paragraphs 9A-9F effective as of October 1, 1981, the end of the State Bar of Michigan's fiscal year and that, in the interim, the bar poll its members to identify those willing to support such other activities on a voluntary basis and permit solicitation of contributions from those members for these purposes.

The bar would be permitted, in the interim, to present further facts to this Court, through a master, only as to those activities for which we have concluded the record is inadequate for the purpose of demonstrating an as yet unrevealed compelling interest unavoidably served by mandatory dues.

B. That the State Bar of Michigan determine the proportion of dues paid by each member which does not relate to the above-declared constitutional purposes and functions, and that the amount of dues as of and after October 1, 1981 be reduced accordingly.

C. That plaintiff Allan Falk be advised of the portion of his excused bar dues which relates to the purposes of the State Bar described in paragraphs 9A-9F, and that he pay to the State Bar that amount within 30 days after he is so notified.

FITZGERALD and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

WILLIAMS, J. The principal issue in this case is whether an "integrated" state bar with mandatory membership of all attorneys in the state can perform specified activities, financed in part by compulsory dues, without violating First Amendment rights of those dues paying member attorneys not in accord with such activities. The complained-of activities specified are the following: (1) lobbying and other political activity, (2) compulsory membership in Young Lawyers Section, (3) promoting prepaid legal services, (4) lawyer referral, (5) lawyer placement, (6) Client Security Fund, (7) public education about legal services, (8) funding of Lawyers Wives of Michigan and Children's Charter of Michigan activities, (9) giving and paying for social functions, including those where the Supreme Court Justices are guests of honor, (10) appearing before the State Officers Compensation Commission in support of higher Supreme Court and other judicial salaries, and (11) sale of use of State Bar mailing roster.

After careful consideration of the authority delegated to the Michigan State Bar and the compelling state interest on the one hand, and the possible infringement of petitioner's First Amendment rights in the 11 specific instances on the other hand, this Court holds that there is no showing of an unconstitutional violation of petitioner's First Amendment rights with respect to the above items, excepting item 11 where we find an invasion of petitioner's right to privacy. We note there was no record reference to political activities, such as support of, or opposition to, partisan candidates and partisan issues, which would be offensive to both the State Bar Rules and the First Amendment.

## I. FACTS

Petitioner is required by state law[1] and by court rule[2] to belong to and pay dues to the Michigan State Bar. It is petitioner's basic contention, culled from both his broad "Petition for Special Relief" and his tripartite pleadings (brief, reply brief and supplemental reply brief), that the use of his compulsory dues monies for the aforementioned State Bar sponsored activities occasions an unconstitutional infringement of his First Amendment rights

---

[1] 1935 PA 58. This act, in pertinent part, provided:

"AN ACT to create the state bar of Michigan; and to authorize the supreme court to provide for the organization, regulation and rules of government thereof.

*"The People of the State of Michigan enact:*

"Sec. 1. There is hereby created an association to be known as the state bar of Michigan, the membership of which shall consist of all persons in the state now or hereafter regularly licensed to practice law in this state.

"Sec. 2. The supreme court is hereby authorized to provide for the organization and regulation of the state bar of Michigan; to provide rules and regulations concerning the conduct and activities of the association and its members; the schedule of membership dues therein, * * * non-payment of which shall be ground for suspension, the ethical standards to be observed in the practice of law, and the discipline, suspension or disbarment of association members. * * *"

[2] Supreme Court Rules Concerning the State Bar of Michigan provide in pertinent part:

"RULE 2. MEMBERSHIP.

"Those persons who are licensed to practice law in this State on December 2, 1935, and those who shall become licensed thereafter to practice law in this State, shall constitute the membership of the State Bar of Michigan subject to the provisions of these rules."

"RULE 4. MEMBERSHIP DUES.

"(a) An active member's dues for each fiscal year (October 1 through September 30), payable at the State Bar's principal office by October 1 of each year, are:

"(1) $150, for a member admitted to practice 3 years or more (counting the fiscal year in which admission took place as a full year), admitted from another jurisdiction, or admitted under Board of Law Examiners Rule 5(D);

"(2) $90, for a member admitted to practice less than 3 years. For the fiscal year of admission, dues are $90 if admitted between October 1 and March 31, and $45 if admitted between April 1 and September 30."

because those activities are not in furtherance of
the "regulation" of the bar.[3] Petitioner would
therefore have us rule[4] that the only State Bar
activities which constitutionally "regulate" the
profession and thus sanction the use of his dues
monies therefor, are those which relate to "regula-
tion and discipline of the profession, continuing
legal education, and related licensing functions",
as well as "associated administrative and other
overhead expenses".

## II. GENERAL BACKGROUND

Petitioner's complaint is based essentially on the
following line of reasoning:

(1) Authority over the integrated state bar de-
rives from 1935 PA 58;

(2) Authority over the integrated state bar is

[3] In addition to his Federal First Amendment arguments (freedom
of association, freedom of speech, freedom of religion, and right to
privacy), petitioner's brief also discusses possible violations of the
Federal Commerce Clause, US Const, art I, § 8, cl 3, and Const 1963,
art 4, § 24 (title-body clause); art 4, § 30 (assent of two-thirds of each
house of the Legislature required for appropriating public money for
private purposes); and art 3, § 2 (separation of powers principle).

[4] This case was commenced as an original proceeding in this Court
on November 30, 1977 when the petitioner filed his "Petition for
Special Relief", naming the State Bar of Michigan as defendant.
Acting on this petition, this Court subsequently appointed former
Judge Maurice E. Schoenberger to conduct hearings and make find-
ings of fact on the issues petitioner raised. 402 Mich 960 (1978). These
hearings were held on June 5 and 6, 1978. Both parties presented
testimony and exhibits relating to the various activities and functions
of the State Bar, and Judge Schoenberger concluded that there were
no controverted factual matters which required resolution.

We agree with Justice RYAN's treatment of this petition as a
complaint for writ of superintending control over the State Bar,
within our original jurisdiction, GCR 1963, 851(6); MCL 600.215,
600.219; MSA 27A.215, 27A.219, and with his interpretation of the
petition for special relief as a request that we relieve petitioner of the
obligation of paying the pro rata portion of his State Bar dues which
relates to the complained-of activities, except insofar as petitioner
requests in his brief that the State Bar be required to remove his
name from its "commercial solicitation mailing list".

confined to "regulation" of the legal profession; "regulation" is limited to the "regulation and discipline of the profession, continuing legal education, and related licensing functions", as well as "associated administrative and other overhead expenses", which do not include the 11 specified activities to which petitioner objects;

(3) Petitioner's First Amendment rights are infringed when the integrated state bar pursues activities other than "regulation" because the petitioner's dues payments may then help finance activities to which petitioner may be ideologically opposed or from which petitioner derives no direct pecuniary benefit;

(4) *Abood v Detroit Board of Education,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), supports petitioner's position.

As a consequence, this Court's inquiry necessarily must consider the following questions among others:

(1) Is the Supreme Court's authority over the integrated state bar derived exclusively from 1935 PA 58, or is it also derived from this Court's inherent power in the administration of justice?

(2) Is authority over the integrated state bar confined to "regulation" of the legal profession in the sense petitioner uses regulation or is the Supreme Court's power broader so as to cover some or all of the 11 specified activities pursued by the State Bar?

(3) What is the legal interplay between petitioner's asserted First Amendment rights and the state's compelling interest in this matter?

(4) What guidance is there for the present matter, where the state's compelling interest is in the improvement of the administration of justice and advancement in jurisprudence, from *Abood* where

the state's compelling interest was in labor peace through collective bargaining?

### III. INHERENT POWER OF THE SUPREME COURT AND STATE BAR RULE 1

The keystone of petitioner's argument is his interpretation of the word "regulation" found in 1935 PA 58, the act which, in its own words, "created" the integrated State Bar in Michigan. According to petitioner, it is this "procreative engendering legislation" from which this Court derives its power to impose dues, and which limits the State Bar to "regulatory" purposes in expending dues monies.

In view of petitioner's assertions concerning both what he perceives to be the definitional perimeters of the word "regulation", and this Court's power respecting the legal profession of this state, we feel it would be advantageous, preliminary to our inquiry into petitioner's First Amendment claims, to examine the existent schema of legislative and judicial action regarding the integration of Michigan's Bar. In so doing we hope to shed some light on the proper scope of the State Bar's authority over the attorneys of this state, as well as set the stage for our consideration of the constitutional issues raised by petitioner.

The first action toward integration of the Michigan Bar was taken by the Legislature through enactment of 1935 PA 58. This act, by its terms, "created" an integrated State Bar in Michigan, *i.e.*, a bar organization in which membership and payment of dues is required as a condition of practicing law in the state.[5] This act also authorized this Court

---

[5] See fn 1, *supra.*

"to provide for the *organization and regulation* of the state bar of Michigan; to provide *rules and regulations concerning the conduct and activities of the association and its members;* the schedule of membership dues therein, * * * non-payment of which shall be ground for suspension, the ethical standards to be observed in the practice of law, and the discipline, suspension or disbarment of association members."[6] (Emphasis supplied.)

That same year this Court promulgated a set of rules for the organization of the State Bar, stating in § 16 of those rules that it did so "pursuant to the powers of the court over the bar of the State and the members thereof", 273 Mich xlv (1935). Section 1 of those rules outlined in broad terms the purposes of the State Bar.

"The association [State Bar of Michigan] shall, under these rules, aid in the promotion of improvements in the administration of justice and the advancement of the science of jurisprudence, in the improvement of the relations between the profession and the public, and in the promotion of the interests of the legal profession in this State." 273 Mich xxxv (1935).[7]

---

[6] The present version of this section is MCL 600.904; MSA 27A.904. There have been several substantive changes in this section, none of which, however, affect our discussion. The present version reads as follows:

"The supreme court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar."

[7] Section 1 of the State Bar Rules has undergone little change since its promulgation in 1935. In its present form it states, in relevant part:

"The state bar of Michigan shall, under these rules, aid in promoting improvements in the administration of justice and advancements in jurisprudence, in improving relations between the legal profession and the public, and in promoting the interests of the legal profession in this state." State Bar Rule 1, 340 Mich xxxviii (1954).

At this point we must recognize that petitioner has expressly disclaimed any assertion that the challenged activities are in violation of the State Bar's "internal constitution" (which we take to mean § 1 of the Rules Concerning the State Bar of Michigan, hereinafter sometimes called State Bar Rule 1 or Rule 1) and, apparently, would not contest the right of the State Bar to engage in these activities on behalf of voluntary contributors.[8] Petitioner having chosen, instead, to base his challenge to the objected-to activities on the First Amendment, it becomes unnecessary for us to dissect each of those activities in order to interpret precisely what falls within and what without the bounds of Rule 1. We therefore, for purposes of this case, will assume that the State Bar has authority under the lawfully delegated power of Rule 1 to perform the acts herein complained of. Nevertheless, since none of the complained-of State Bar activities were expressly provided for by either the Legislature in 1935 PA 58, or subsequent amendments to that section, or the judiciary in its rules concerning the State Bar, petitioner's constitutional challenge requires us to determine if these activities are constitutionally legitimate activities of the State Bar under the broad purposes enunciated in Rule 1. Of course, before we can undertake our First Amendment scrutiny, we must determine whether State Bar Rule 1 and the interests it advances are valid. It is to this consideration that we now turn.

In order to determine the validity of State Bar Rule 1, we must, to some extent, consider the respective powers of the Legislature and this Court

---

[8] In passing, we observe that if petitioner in referring to political activities had in mind the support of and opposition to partisan candidates and partisan issues, Rule 1 certainly does not sanction such activity, as the State Bar has properly recognized.

over attorneys of this state. In so doing, however, it would serve no useful purpose toward the resolution of this issue to become enmeshed in an abstract discussion of the precise measure of respective control that the Legislature and this Court could constitutionally exercise in this regard. It is sufficient for the purposes of our present discussion to recognize that courts have traditionally sought to harmonize their legitimate concerns with those of the Legislature. Thus while on the one hand courts are willing to acknowledge that the Legislature has a legitimate interest in the members of the bar because of its concern on behalf of the public interest and welfare, see *e.g., Button v Day,* 204 Va 547, 554; 132 SE2d 292, 297 (1963); *Detroit Bar Ass'n v Union Guardian Trust Co,* 282 Mich 707, 712; 281 NW 432 (1938), quoting from *In re Cannon,* 206 Wis 374, 397; 240 NW 441 (1932), the courts have been emphatic in recognizing their own peculiar and special interest in the conduct of attorneys since, as officers of the court by virtue of the practice of their profession (see GCR 1963, 908; MCL 600.901; MSA 27A.901), attorneys are " 'indispensable to the administration of justice and [are] intimate and peculiar in [their] relation to, and vital to the well-being of, the court' ". *Sams v Olah,* 225 Ga 497, 504; 169 SE2d 790, 798 (1969). See also *Button, supra,* 553-554; *In re Petition for Integration of the Bar of Minnesota,* 216 Minn 195, 199; 12 NW2d 515, 518 (1943). Thus courts have recognized in themselves an inherent power to regulate the practice of law and to supervise those engaged therein to the extent necessary for their proper functioning and generally find legislative regulation unconstitutional only when it tends to interfere with or impair the proper administration of judicial functions. *Guardian Trust Co, supra,* 713; *Olah, supra,* 501-502.

Thus in passing on the present conjunction of legislative and judicial action relating to the integration of the State Bar in Michigan, this Court has tempered its willingness to accord legislative enactments the proper degree of deference due a co-equal branch of government with a persistent insistence on its own inherent powers.[9] In *Ayres v Hadaway,* 303 Mich 589, 597-598; 6 NW2d 905 (1942), this Court stressed its own inherent power over attorneys of this state, while at the same time upholding the constitutionality of 1935 PA 58 against the contention that it violated due process since the court rules concerning the State Bar provided that inactive members of the bar were prohibited from practicing law. After citing several foreign jurisdictions on the subject of the inherent power of a court to regulate attorneys, this Court stated:

"In our opinion there is inherent power in the Supreme Court to regulate the qualifications of persons who may be permitted to practice law in this state. That the legislature has seen fit to adopt legislation [1935 PA 58] to this end does not make the act unconstitutional."

This Court reiterated, in more detail, essentially the same position almost two decades later when it held the State Bar's property in Lansing to be tax exempt public property in *State Bar of Michigan v Lansing,* 361 Mich 185, 194; 105 NW2d 131 (1960):

"The provisions of this act [1935 PA 58] are such as to clearly indicate that it was the intent of the legisla-

[9] In Michigan this inherent power derives in part from article 6, § 5 of our 1963 Constitution which states that:
"The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state." See *In re Schlossberg,* 388 Mich 389, 395; 200 NW2d 219 (1972).

ture to provide for the organization of an agency that should function pursuant to rules and regulations prescribed by the Supreme Court for the purpose of performing, and assisting in the performance of *functions that, in the final analysis, pertain to the judiciary.* Clearly if such was not the intention there would have been no attempt to invest this Court with the powers of organization and regulations obviously contemplated by the language of the statute.

\* \* \*

"These are matters [matters pertaining to the discipline, suspension, or disbarment of members of the profession and the fixing of ethical standards to be observed in the practice of law] that relate to the public welfare and protection. *Likewise, they are matters within the scope of the inherent power of the judiciary."* (Emphasis supplied.)

Because there has been legislative action on the subject, there is no necessity for this Court to now assert inherent power to integrate the Bar independent of or contrary to legislative action.[10] See *Button v Day, supra,* 554.

As to whether State Bar Rule 1—with its broad injunction to "aid in promoting improvements in the administration of justice" etc. (as opposed to petitioner's narrowly construed "regulation")—is valid or not, we rule in the affirmative for two reasons. First, we believe that State Bar Rule 1 is consistent with the legislative purpose, expressed in 1935 PA 58, that this Court provide for the "regulation" of the State Bar and adopt "rules and regulations concerning the conduct and activities

[10] State Supreme Courts that have directly confronted the question of their inherent power to integrate their State Bars have, to the best of our knowledge, unanimously held themselves to possess such power. See, *e.g., Wallace v Wallace,* 225 Ga 102, 109-110; 166 SE2d 718, 723 (1969); *In the Matter of Integration of the Bar of Hawaii,* 50 Hawaii 107, 109; 432 P2d 887, 888 (1967); *In re Unification of the New Hampshire Bar,* 109 NH 260, 264; 248 A2d 709, 712 (1968).

of the association and its members". This Court
stated as much in *Lansing, supra,* 194:

"The rules and regulations that have been adopted
are consistent with the legislative purposes, as disclosed
by the act [1935 PA 58]."

Indeed, we know of no rule of statutory construc-
tion which would counsel this Court to interpret
"regulation" in the narrow and confining sense
petitioner advocates (remembering that we are not
at this point addressing any constitutional implica-
tions of State Bar Rule 1). To provide the flexibil-
ity necessary to help this Court insure that the
State Bar can achieve such worthy results as, to
quote one state supreme court, " 'restor[ing] public
confidence in the bar, enlarg[ing] professional con-
sciousness, energiz[ing] the bar's responsibility to
the public, * * * improv[ing] the administration of
justice and [being] the only means presented
whereby every member of the bar can share in its
public and professional responsibility' ", *In re Uni-
fication of the New Hampshire Bar,* 109 NH 260,
267; 248 A2d 709, 714 (1968), quoting from *Petition
of Florida State Bar Ass'n,* 40 So 2d 902, 909 (Fla,
1949), we believe the Legislature intended "regula-
tion" to be defined expansively. *Cf.* the broad
reading given the word "regulate" found in the
Commerce Clause of the Federal Constitution, US
Const, art I, § 8, cl 3. See *Virginia R Co v System
Federation No 40,* 84 F2d 641, 650-651 (CA 4,
1936); *Chicago, M, SP & P R Co v Public Service
Comm,* 332 Mich 291, 296; 50 NW2d 884 (1952).

Second, and independent of the above construc-
tion of the word "regulation", we do not doubt
that this Court possessed the inherent power to
include in its rules and regulations for the integra-

tion of the Bar the provisions of State Bar Rule 1. In fact, the provisions of State Bar Rule 1 represent a garden variety statement of the legitimate purposes of an integrated bar which other state supreme courts have either considered when making the decision to judicially integrate a bar, see *In re Unification of the New Hampshire Bar, supra,* 263-264, or which the courts themselves have adopted through the exercise of their inherent powers. See *Button, supra,* 555; *Application of the President of the Montana Bar Ass'n,* 163 Mont 523, 526-527; 518 P2d 32, 34 (1974); *Lathrop v Donohue,* 367 US 820, 828-829; 81 S Ct 1826; 6 L Ed 2d 1191 (1961).

## IV. CONSTITUTIONAL CHALLENGES

Having examined the authority and scope of the State Bar Rules, we now turn to petitioner's constitutional challenges. Petitioner maintains that his First Amendment rights are being violated by the State Bar's expenditure of mandatory dues for activities unrelated to the licensing, education and regulation of the legal profession. Although conceding that the state may require attorneys to belong to an integrated bar association, petitioner argues that the State Bar may not constitutionally expend funds on activities which "may [support] positions inconsistent with mine".

In order to analyze the constitutional validity of petitioner's claim, we must determine:

a) whether First Amendment rights are absolute;

b) what type of state interest justifies intrusion on First Amendment rights;

c) what means may the state employ to promote the permissible state interest;

d) does Bar Rule 1 embody a permissible state interest; and

e) are the 11 complained-of State Bar activities permissible means to promote the permissible state interest.

We find that the First Amendment is not absolute but will give way to certain state activities which are germane to a compelling state interest. The state has a compelling interest in promoting improvements in the administration of justice and advancing the science of jurisprudence in order to fulfill its function of protecting the health, safety and welfare of its citizens. The state may employ activities which are germane to this compelling state interest. We find that insofar as State Bar Rule 1 authorizes the Bar to "aid in promoting improvements in the administration of justice and advancements in jurisprudence" it embodies a permissible state interest. After carefully reviewing petitioner's 11 challenges, we also find that all but the last activity, regarding the use of the State Bar mailing list for commercial solicitations, are germane to the state's compelling interest.

## A. Are First Amendment Rights Absolute?

The First Amendment states:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The Supreme Court has long recognized that "[f]reedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment". *De*

*Jonge v Oregon,* 299 US 353, 364; 57 S Ct 255; 81
L Ed 278 (1937). See *Near v Minnesota ex rel
Olson,* 283 US 697, 707; 51 S Ct 625; 75 L Ed 1357
(1931); *Gitlow v New York,* 268 US 652, 666; 45 S
Ct 625; 69 L Ed 1138 (1925). In contrast to the
rights of freedom of religion, speech, press, and
assembly, the right to freedom of association is not
expressly listed in the First Amendment. Never-
theless, "[i]t is beyond debate that freedom to
engage in association for the advancement of be-
liefs and ideas is an inseparable aspect of the
'liberty' assured by the Due Process Clause of the
Fourteenth Amendment". *NAACP v Alabama ex
rel Patterson,* 357 US 449, 460; 78 S Ct 1163; 2 L
Ed 2d 1488 (1958). It is thus clear that freedom of
speech and of association are both protected under
the First and Fourteenth Amendments.

However, the rights to free speech and associa-
tion are not absolute. In *Konigsberg v State Bar of
California,* 366 US 36, 49; 81 S Ct 997; 6 L Ed 2d
105 (1961), the Court "reject[ed] the view that
freedom of speech and association * * * are
'absolutes' " and held that the denial of petition-
er's application to the California Bar for failure to
answer any questions pertaining to his member-
ship in the Communist Party did not violate the
First Amendment.[11] The Court reaffirmed this con-
cept 12 years later in *United States Civil Service
Comm v National Ass'n of Letter Carriers, AFL-
CIO,* 413 US 548, 567; 93 S Ct 2880; 37 L Ed 2d
796 (1973). In upholding the prohibition of federal
employees from taking an active part in political

[11] Justice Harlan pointed out: "the law relating to libel, slander,
misrepresentation, obscenity, perjury, false advertising, solicitation of
crime, complicity by encouragement, conspiracy, and the like" cannot
be logically reconciled with the absolutist position. *Konigsberg, supra,*
49, fn 10. Even Justice Douglas conceded that the right to associate is
not absolute. *Lathrop v Donohue,* 367 US 820, 882; 81 S Ct 1826; 6 L
Ed 2d 1191 (1961) (dissent).

management or in political campaigns in accordance with § 9 of the Hatch act, 5 USC 7324(a)(2), Justice White acknowledged: "[n]either the right to associate nor the right to participate in political activities is absolute". That there are limits to the First Amendment's protection was recognized in *Buckley v Valeo*, 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976), where the Court declared that "[e]ven a ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest".[12] Thus it is clear that the rights of freedom of speech and association, while fundamental to our Constitution and society, are not absolute.

## B. What Type of State Interest Justifies First Amendment Intrusion

Although the First Amendment is not absolute the state must demonstrate a particular type of interest to justify constitutional intrusions. The question which we must resolve is what type of state interest is necessary.

"To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong." *United States v O'Brien*, 391 US 367, 376-377; 88 S Ct 1673; 20 L Ed 2d 672 (1968).

For example, in affirming an order that injunctive relief be given to state government employees threatened with being discharged solely because

---

[12] *Buckley v Valeo*, 424 US 1, 25; 96 S Ct 612; 46 L Ed 2d 659 (1976) (upholding the limitation on, and reporting of, political contributions by the Federal Election Campaign Act of 1971, 2 USC 431 *et seq.*, but finding the limitation of independent and candidate expenditures violative of the First Amendment).

they were not affiliated with or sponsored by the Democratic Party, the Supreme Court held:

"It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. *Buckley v Valeo,* 424 US, at 64-65; *NAACP v Alabama,* 357 US 449, 460-461 (1958). * * * Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.' *Kusper v Pontikes,* [414 US 51, 58; 94 S Ct 303; 38 L Ed 2d 260 (1973)]. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." *Elrod v Burns,* 427 US 347, 362; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (plurality).

Similarly when analyzing whether Illinois' state interest in protecting the effective right to participate in political primaries justified a state court injunction prohibiting a group of party members from acting as convention delegates the Supreme Court held:

"Even though *legitimate,* the ' "subordinating interest of the State must be *compelling"* * * *' to justify the injunction's abridgment of the exercise by petitioners and the National Democratic Party of their constitutionally protected rights of association. *NAACP v Alabama,* 357 US 449, 463 (1958)." *Cousins v Wigoda,* 419 US 477, 489; 95 S Ct 541; 42 L Ed 2d 595 (1975).

Thus the First Amendment must yield to state intrusion when there is a compelling state interest present.

*C. The Means Employed to Promote the Permissible State Interest*

Having found that the state must show a compelling interest to justify First Amendment intrusion we must look to the appropriate *means* which the state may employ to achieve its compelling

interest. Where the intrusive limitation on association *directly* affects the First Amendment right of expression (here political expression), as where a statute precludes voting in one party's primary within 23 months after voting in another party's primary, *Kusper v Pontikes,* 414 US 51, 58-59; 94 S Ct 303; 38 L Ed 2d 260 (1973), or where not belonging to a particular political party results in discharge from a government job, *Elrod v Burns,* 427 US 347, 363; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (plurality), the Court has adopted the strict, "least intrusive means" test.[13] In contrast, where the intrusive limitation on association *indirectly* affects the First Amendment right of expression, as where employees, though free to express their own views without limitation, are required to belong, and pay dues, to a union which may hold views different from the employees, *Abood v Detroit Board of Education,* 431 US 209, 225-226; 97 S Ct 1782; 52 L Ed 2d 261 (1977), the Supreme Court has applied the less restrictive "germane" test.[14]

---

[13] For example, holding that the Illinois Election Code violated the First Amendment by prohibiting a person from voting in a primary election of a political party if that person had voted in another party's primary within the previous 23 months, Justice Stewart described when and how the least intrusive means test applies:

"[A] significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest. * * * For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. * * * If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper, supra,* 58-59.

[14] See also *Lathrop v Donohue,* 367 US 820, 843; 81 S Ct 1826; 6 L Ed 2d 1191 (1961), where the Supreme Court held:

"Both in purport and in practice the bulk of [the Wisconsin] State Bar activities serve the function * * * of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of

The most recent case in which the Supreme Court has taken a constitutional stand on the right of association is *Abood.* The Court upheld against First Amendment attack MCL 423.211; MSA 17.455(11) authorizing the use of agency shop clauses in collective bargaining agreements covering government employees, *Abood, supra,* 222, but overturned the use of mandatory dues for political purposes and for advancing ideological causes unrelated to collective bargaining. *Abood, supra,* 235-236. We note that the Court did not use the strict "least intrusive means" test in analyzing Abood's associational rights in either instance. Rather, the Court used the "germane" test and found that the Michigan Legislature had an "important governmental interest" in avoiding confusion which could arise from conflicting demands of rival teacher's unions; promoting labor peace; and preventing "free riders" from obtaining labor contract benefits without supporting bargaining expenses. *Abood, supra,* 224-225. The Court similarly found that the

Wisconsin, in order to further the State's *legitimate interests* in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, *we are unable to find any impingement upon protected rights of association."* (Emphasis supplied.)

The plurality of four was unwilling to decide whether Lathrop's "rights of free speech are infringed if his dues money is used to support the political activities of the State Bar" because they felt the record was insufficiently developed. *Lathrop, supra,* 844-845. However, three justices would have found that none of the Wisconsin Bar's activities violated any of Lathrop's constitutional rights. *Lathrop, supra,* 848 (opinion of Harlan, J., Frankfurter, J., concurring); 865 (opinion of Whittaker, J., concurring in result). The other two justices who addressed the freedom of speech issue, would have prohibited Wisconsin Bar from using mandatory dues revenue to advocate positions which any of its members opposed, *Lathrop, supra,* 865 (opinion of Black, J.); 877 (opinion of Douglas, J.).

expenditure of *mandatory union dues* "for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes *not germane* to its duties as collective bargaining representative" violated the First Amendment right of union members who do not support such views, candidates or ideologies. Thus the Court's test in *Abood* was whether the expenditures were "germane to [the union's] duties as collective-bargaining representative".[15] Therefore we believe that the appropriate test to analyze petitioner's constitutional challenges is whether the state has a compelling interest involved, and if so, whether the Bar's complained-of activities are germane to that interest.[16]

## D. Does Rule 1 Embody a Compelling State Interest?

The underlying question we must now address is whether "promoting improvements in the administration of justice and advancements in jurisprudence" is a compelling state interest? We find that it is. The United States Supreme Court implicitly recognized the state's compelling interest in promoting improvements in the administration of justice and advancements in jurisprudence in *Lathrop, supra,* 843, where Justice Brennan wrote:

"We think that the Supreme Court of Wisconsin, in order to further the State's *legitimate interests* in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the law-

---

[15] *Abood, supra.*

[16] We have, of course, decided upon the rationale of germaneness to a compelling state interest. However, we believe that an integrated state bar would be the least intrusive means to effectuate the compelling state interest. See *Application of the President of the Montana Bar Ass'n,* 163 Mont 523, 526; 518 P2d 32, 33 (1974).

yers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association." (Emphasis supplied.)

In *Goldfarb v Virginia State Bar,* 421 US 773, 792-793; 95 S Ct 2004; 44 L Ed 2d 572 (1975), the Court explicitly recognized this legitimate state interest to be compelling:

"We recognize that the States have a *compelling interest* in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. * * * *The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'* See *Sperry v Florida ex rel Florida Bar,* 373 US 379, 383 [83 S Ct 1322; 10 L Ed 2d 428] (1963); *Cohen v Hurley,* 366 US 117, 123-124 [81 S Ct 954; 6 L Ed 2d 156] (1961); *Law Students Research Council v Wadmond,* 401 US 154, 157 [91 S Ct 720; 27 L Ed 2d 749] (1971)." (Emphasis supplied.)

The fair and efficient use of the state legal system is paramount to the state's very existence. Without a legal system to make, interpret and enforce laws, without some mechanism to weigh and resolve conflicting claims, there is anarchy.

As officers of the court, lawyers play an indispensable role in the administration of justice. The state must not only protect its legal machinery from abuse through such safeguards as the attor-

ney grievance procedure but must also be mindful
of the competence of attorneys, who are in a
position to best assist, or most impede, the general
public in securing justice. Authorizing the State
Bar to aid the state in promoting improvements in
the administration of justice is essential for the
state's continued existence. Therefore we find that
the state has a compelling interest in instructing
that "[t]he state bar of Michigan shall, under these
rules, aid in promoting improvements in the ad-
ministration of justice and advancements in juris-
prudence". We do not separately consider whether
the state's interest "in improving relations be-
tween the legal profession and the public, and in
promoting the interests of the legal profession in
the State", State Bar Rule 1, are compelling.

With this determination in mind we now will
examine petitioner's individual challenges to de-
termine if the Bar activities are germane to the
state's compelling interest.

*E. Are the Bar Actions in the 11 Points Germane?*

Petitioner attacks the following State Bar activi-
ties as violating his constitutional rights: (1) engag-
ing in legislative and judicial lobbying and partici-
pating in other political activities (presumably
supporting political candidates or state referen-
dums); (2) requiring compulsory membership in
the Young Lawyers Section; (3) promoting prepaid
legal services; (4) supporting lawyer referral ser-
vices; (5) aiding in lawyer placement; (6) maintain-
ing a Client Security Fund; (7) promoting legal
services and educating the public through pam-
phlets, magazines, radio and television advertise-
ments of the availability and need of legal ser-
vices; (8) funding Lawyers Wives of Michigan and
Children's Charter of Michigan; (9) giving and
paying for social functions, including receptions
where the Supreme Court Justices are guests of

honor; (10) appearing before the State Officers
Compensation Commission in support of higher
Supreme Court, and other judicial, salaries; and
(11) selling the use of the State Bar mailing roster
to commercial interests. He bases the majority of
his claims on the First Amendment right to free-
dom of association, with an occasional reference to
the First Amendment's freedom of speech, religion
and privacy;[17] the Commerce Clause;[18] and various

[17] Nowhere in either his complaint or brief does petitioner specifi-
cally allege a violation of his right to freedom of speech. However,
since petitioner claims that the use of Bar dues for non-"regulation"
purposes constitutes "a violation of [petitioner's] First Amendment
rights" and places strong reliance on *Abood, supra,* we will analyze
petitioner's charges in light of both his right of freedom of association
and freedom of speech.

Petitioner argues that certain State Bar expenditures violate the
First Amendment's prohibition on the establishment of religion:

"The use of State Bar dues monies to purchase alcoholic beverages,
pork and shellfish for consumption at social functions, particularly
when not all State Bar members are invited to such functions or
offered alternatives of equal value for dues paid, and which are
unnecessary to the accomplishment of any goal central to the viabil-
ity of the State Bar as a regulatory body, violates the rights of
petitioner and other State Bar members under the free exercise and
establishment of religion clauses of the First Amendment."

Petitioner has failed to show any instance when *only* these objec-
tionable foods and beverages were served. If a person attends a
cocktail party, luncheon, or dinner, he or she may select nonobjection-
able food and beverage to consume. For example, cocktail parties
have nonalcoholic drinks, such as sodas, gingerale, fruit juices, tonic
water, etc., in order to serve mixed drinks. Luncheons and dinners
rarely serve only pork and shellfish. Even a vegetarian, whether for
religious or health purposes, can find sufficient quantities of vegeta-
bles, cereals, baked goods and other nonmeat foods to form a nutri-
tious meal. Petitioner, therefore, cannot complain that he is being
forced to either consume objectionable victuals or go hungry. Nor
may petitioner impose his religious views on proper consumption on
others. Simply put, petitioner has the right to attend general Bar
functions and choose from a reasonable selection of foods and bever-
ages that which he finds satisfactory to consume. He does not,
however, have the right to limit other Bar members to his self-
imposed diet. By providing a reasonable selection of foods and bever-
ages to its members the Bar cannot be accused of establishing or
promoting any religion.

Petitioner's right to privacy argument is treated in section IV,
E(11), *infra.*

[18] US Const, art I, § 8, cl 3. Petitioner argues that "[t]he Due

provisions of the Michigan Constitution.[19]

## (1) Lobbying and Other Political Activity

The major complaint of petitioner is that the State Bar annually expends in violation of his First Amendment rights large sums of money for two related programs: (1) "for the purpose of influencing the legislation pending before the Michigan Legislature" and (2) "to fund study projects by its constituent committees which result in recommen-

Process Clause of the Fourteenth Amendment in conjunction with the Commerce Clause requires that fees which affect interstate commerce must not be 'excessive in comparison with the governmental benefits conferred.' *Evansville-Vanderburgh Airport Authority Dist v Delta Airlines, Inc,* 405 US 707, 717; 92 S Ct 1349; 31 L Ed 2d 620 (1972) * * *. Moreover, the imposition of economic burdens on activities in interstate commerce must be 'reasonable and fixed according to some uniform, fair and practical standard'. *Hendrick v Maryland,* 235 US 610; 35 S Ct 140; 59 L Ed 385 (1915)".

We recognize that the practice of law may be subject to the Commerce Clause in certain instances, see *Goldfarb v Virginia State Bar,* 421 US 773, 785; 95 S Ct 2004; 44 L Ed 2d 572 (1975) (minimum fee schedules published by county bar association and enforced by state bar violated § 1 of the Sherman act, 15 USC 1). However, petitioner has failed to show how the expenditure of State Bar mandatory dues for the promotion of the administration of justice is either excessive or a burden on interstate commerce. Therefore we find petitioner's claim to be spurious.

[19] Petitioner claims that 1) "[t]he use of State Bar dues monies for 'public' purposes not germane to its regulatory functions [as narrowly defined by petitioner] violates the title-body clause, Const 1963, art 4, § 24" [Petitioner's Brief, p 8]; 2) that such use "is illegal as * * * not having been authorized pursuant to the procedure required by Const 1963, art 4, § 30" to expend public money for a private purpose; and 3) that "[t]he Supreme Court lacks the power to authorize use of State Bar dues for non-regulatory purposes. * * * [T]o purport to authorize expenditures for additional purposes * * * would run afoul of the separation of powers principle ensconced in Const 1963, art 3, § 2".

Having recognized that this Court has the inherent power to regulate the legal profession in addition to any legislative authorization and having further found promulgation of State Bar Rules to be a valid exercise of that power, we reject petitioner's assertions as to the title-body clause, find that the Bar expenditures are for a public purpose, and rule that there is no violation of the separation of powers clause.

dations of policies to be adopted publicly by officials and agencies of the State of Michigan through executive or legislative or administrative action". Expenditures for the various committees reviewing the Michigan Land Title Standards and Criminal Code and Criminal Procedure Code, for the committee considering this Court's proposed Rules of Evidence, and to support the Bar's prison paralegal project are cited by petitioner as examples of improper use of Bar dues monies. There is nothing on the record to indicate Bar participation in partisan politics. But see fn 8.

Petitioner maintains that the Bar may only disburse its funds for "regulation" purposes. As aforementioned, part I, *supra,* petitioner limits "regulation" to "bar grievance activities, the expenses of the character and conduct committee, and subsidies paid to the Institute for *[sic:* of] Continuing Legal Education (ICLE), plus associated administrative and other overhead expenses". Petitioner argues that any other expenditure of mandatory Bar dues monies violates the First Amendment's right to freedom of association since membership in the Michigan State Bar Association is a prerequisite to the practice of law in this state.

Petitioner supports his position by claiming: "*Abood* controls the instant case and mandates a ruling in petitioner's favor." His argument is: "Conceptually, the State Bar of Michigan is a union shop.[20] This fact was implicitly recognized in *Abood"*. He then states: "The specific holding in

---

[20] "Under a union-shop agreement, an employee must become a member of the union within a specified period of time after hire, and must as a member pay whatever union dues and fees are uniformly required." *Abood, supra,* 217, fn 10. See 43 Words and Phrases, Union Shop, p 494.

*Abood* is that the employees of an agency shop[21] who object to the use of agency shop fees for political activity are entitled to a pro rata reduction in their fee assessment equal to the proportion *ideological expenditures* bear to the total union budget" (emphasis supplied).

The exact words of the Court in *Abood,* in pertinent part, follow:

"We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward *the advancement of other ideological causes not germane to its duties as collective-bargaining representative.* Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." (Emphasis supplied.) *Abood, supra,* 235-236. (Footnotes omitted.)

The significant language in the quotation from the Court's opinion is in italics, because it indicates the difference between what the Court held and what petitioner asserts. The Court proscribed expenditures of dues money for *"the advancement of other ideological causes not germane to its duties as collective-bargaining representative",* whereas petitioner speaks of *"ideological expenditures"* without any limitation. The difference, of course, is whether the ideological expenditure was or was not "germane" to the state's compelling interest.

---

21 An agency shop is an "arrangement, whereby every employee represented by a union—even though not a union member—must pay to the union, as a condition of employment, a service fee equal in amount to union dues". *Abood, supra,* 211. See 2A Words and Phrases (1978-1979 Supp), Agency Shop, pp 73-74.

The significance of this distinction is emphasized by a quotation from the *Abood* Court as follows:

"An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. * * * To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But * * * such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Abood, supra,* 222.

It is obvious from our analysis thus far that all ideological expenditures are not necessarily in derogation of compulsory membership First Amendment rights and that the Court's critical test is whether the ideological expenditure is or is not "germane" to the state interest. This leaves the ultimate inquiries first, what is the compelling state interest, and second, whether the ideological expenditure is "germane" to that interest.

We have already considered and developed the state's interest in the administration of justice and in the advancement of jurisprudence. As a consequence we have a clear concept of what the state's compelling interest is in this case.

Our next inquiry therefore is whether or not the complained-of action here is "germane" to the administration of justice and the advancement of jurisprudence. "Lawyers, as members of an ancient and honorable profession, have a duty to utilize their training and experience in rendering

service to the public."[22] The state has a valid interest in drawing upon this training and experience in order to promote improvements in the administration of justice and to advance jurisprudence.[23] The better attuned the legal machinery is to the public's needs of health, safety and welfare, the better the state will be able to perform its job of protecting and serving the public. The input and feedback on proposed legislation and court rules is invaluable to the state in fine-tuning its legislative and judicial systems.[24] The State Bar's 44 standing committees and 12 special committees ensure that the collective experience of legal ex-

[22] In the Matter of the Florida Bar Board of Governors' Action on Adoption of Proposed New State Constitution, 217 So 2d 323, 324 (Fla, 1969). See Roscoe Pound, The Lawyer from Antiquity to Modern Man (St Paul: West Pub, 1953).

[23] Justice Harlan noted how important input from the legal profession is to the legislative and judicial branches:

" '[T]he composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law' [Lathrop v Donohue, 10 Wis 2d 230, 239-240; 102 NW2d 404 (1960)] may well be as helpful and informative to a state legislature as the work of individual legal scholars and of such organizations as the American Law Institute, for example, is to state and federal courts. * * * The function such groups serve is a rationalizing one and their power flows from and is limited to their ability to convince by arguments from generally agreed upon premises. They are exercising the techniques and knowledge which lawyers are trained to possess in the task of solving problems with which the legal profession is most familiar. The numberless judicial citations to their work is proof enough of their own usefulness in the judicial decision-making process.

"Legislatures too have found that they can benefit from a legal 'expert's effort to improve the law in technical and noncontroversial areas.' Dulles v Johnson, 273 F2d 362, 367 [CA 2, 1959]. In the words of the Executive Secretary of the New York Law Revision Commission, there are areas in which 'lawyers as lawyers have more to offer, to solve a given question, than other skilled persons or groups.' [MacDonald, Foreword to the Symposium,] 40 Cornell L Q 641, 644 [1955]. See also Cardozo, A Ministry of Justice, 35 Harv L Rev 113 [1921]." Lathrop, supra, 863 (Harlan, J., concurring).

[24] "The office of attorney is indispensable to the administration of justice and is intimate and peculiar in its relation to, and vital to the well-being of, the court." 7 CJS, Attorney and Client, § 4, p 802, quoted with approval in Sams v Olah, 225 Ga 497, 504; 169 SE2d 790, 798 (1969).

perts in many fields will be voiced in the legislative and judicial process to promote improvements in the administration of justice and the advancement of jurisprudence.[25] In this manner the Legislature and Court can better arrive at a fair, effective and efficient result. Thus the state's need in receiving input and feedback from the Bar on appropriate proposed legislation and court rules is germane to its compelling interest in promoting improvements in the administration of justice and the advancement of jurisprudence.

Without more we hold that the State Bar's use of money, including some of petitioner's, to influence legislation and to fund committee study projects looking to that result is "germane" to the state's legitimate and compelling interest in the administration of justice and the advancement of jurisprudence with the result that such activity survives First Amendment attack and that there is nothing in *Abood* to the contrary.

In passing, however, some comment might be in order on petitioner's misunderstanding of *Abood*. *Abood*, like its predecessors,[26] involved a labor

---

[25] For example the Revision of Criminal Procedure Special Committee helps draft and critique "proposed codification of all laws and court rules pertaining to criminal procedure". Bylaws of the State Bar of Michigan, art V, 59 Michigan Bar J 49r, 54r (April, 1980). See also the Special Committees on the Criminal Code Revision and the Standard Criminal Jury Instructions and the Standing Committees on Civil Procedure and Legislation. *Id.,* 52r-54r. By obtaining input from members of both plaintiffs' and defendants' bar this Court has had a strong foundation upon which to build a comprehensive judicial system. However, any expenditures toward objectives other than the administration of justice or the advancement of jurisprudence, such as promotion of sports or arts, would be offensive both to Rule 1 and petitioner's First Amendment rights.

[26] See *Brotherhood of Railway & Steamship Clerks v Allen,* 373 US 113; 83 S Ct 1158; 10 L Ed 2d 235 (1963) (manifestation of opposition to any political expenditure of union shop dues is sufficient to state a cause of action); *International Ass'n of Machinists v Street,* 367 US 740, 768; 81 S Ct 1784; 6 L Ed 2d 1141 (1961) (Railway Labor Act, 45 USC 152[11], held to permit compulsory union dues only for collective

union. The case at bar, like *Lathrop v Donohue,*[27]

---

bargaining purposes and not for partisan political purposes); *Railway Employes' Dep't v Hanson,* 351 US 225; 76 S Ct 714; 100 L Ed 1112 (1956) (Railway Labor Act, *supra,* upheld against First and Fifth Amendment challenges).

[27] 367 US 820; 81 S Ct 1826; 6 L Ed 2d 1191 (1961) (Wisconsin integrated Bar is not unconstitutional insofar as it merely requires lawyers practicing within the state to become members and pay reasonable annual dues). We reject petitioner's claim that *Abood* essentially overruled *Lathrop.* Justice Stewart, writing for the majority, noted that the Court could not avoid making a ruling in *Abood* on the constitutionality of using mandatory union dues for political and ideological purposes as they had in *Street.* He then footnoted the following observation:

"In *Lathrop v Donohue,* 367 US 820, a companion case to *[International Ass'n of Machinists v] Street* [367 US 740; 81 S Ct 1784; 6 L Ed 2d 1141 (1961)], a lawyer sued for the refund of dues paid (under protest) to the integrated Wisconsin State Bar. The dues were required as a condition of practicing law in Wisconsin. The plaintiff contended that the requirement violated his constitutionally protected freedom of association because the dues were used by the State Bar to formulate and to support legislative proposals concerning the legal profession to which the plaintiff objected.

"A plurality of four Justices found that the requirement was not on its face unconstitutional, relying on the analogy to *[Railway Employes' Dep't v] Hanson* [351 US 225; 76 S Ct 714; 100 L Ed 1112 (1956)]. And the plurality ruled, as had the Court in *Hanson,* that the constitutional questions tendered were not ripe, for the Court was nowhere 'clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities.' 367 US, at 845-846. The other five Members of the Court disagreed with the plurality and thought that the constitutional questions ought to be reached. Three Justices would have upheld the constitutionality of using compulsory dues to finance the State Bar's legislative activities even where opposed by dissenting members. See *id.,* at 848 (Harlan, J., concurring in judgment); *id.,* at 865 (Whittaker, J., concurring in result). The other two Justices would have held such activities to be unconstitutional. See *ibid.* (Black, J., dissenting); *id.,* at 877 (Douglas, J., dissenting).

"The only proposition about which a majority of the Court in *Lathrop* agreed was that the constitutional issues should be reached. However, *due to the disparate views of those five Justices on the merits and the failure of the other four Members of the Court to discuss the constitutional questions, Lathrop does not provide a clear holding to guide us in adjudicating the constitutional questions here presented." Abood v Detroit Board of Education,* 431 US 209, 233, fn 29; 97 S Ct 1782; 52 L Ed 2d 261 (1977) (emphasis added).

Thus the Supreme Court did not overrule *Lathrop* but merely noted in passing that the plurality opinion was not based on constitutional

deals with an integrated bar association.

While there are superficial similarities between an integrated state bar and a labor union, that is not the question. The question is whether the compelling state interest justifying intrusion on First Amendment rights is the same in both cases. The answer is an emphatic negative. In *Abood* the compelling state interest is achieving labor peace through collective bargaining. In an integrated bar the compelling state interest is the administration of justice. Obviously what might be germane to collective bargaining could be quite different from what is germane to the administration of justice. A labor union, for example, would at the most have indirect interest in improvement of court rules, whereas an integrated state bar could have intense interest in such rules.

Further, we note that petitioner in his original brief does not maintain that he holds political or ideological views contrary to those of the State Bar. Petitioner broadens his argument somewhat in his Reply Brief, p 40, when he states: "Public interest is not a unitary concept * * *; the State Bar officers have their view and plaintiff has his. Plaintiff cannot be required to underwrite the expense of the former in promulgating their views". However, petitioner failed to specify even one conflicting view but noted instead: "plaintiff does not seek to prohibit the State Bar from lobbying, [but] merely from spending plaintiff's money to do so". Therefore petitioner's challenges appear to be monetary rather than ideological.

However, even assuming petitioner has strong ideological objections to certain State Bar positions, he "is still free to voice his own views on

grounds and therefore, like *Street,* could be of no precedential guidance.

any subject in any manner he wishes". *In re Unification of the New Hampshire Bar,* 109 NH 260, 266; 248 A2d 709, 713 (1968); accord, *Lathrop, supra,* 861 (Harlan, J., concurring in result).[28] He is not being forced to proclaim any ideological or political view. As Justice Harlan noted in his concurrence in *Lathrop, supra,* 859, "Surely the Wisconsin Supreme Court is right when it says that petitioner can be expected to realize that 'everyone understands or should understand' that the views expressed are those 'of the State Bar as an entity separate and distinct from each individual.' *[In re Integration of the Bar,* 5 Wis 2d 618, 623; 93 NW2d 601, 603 (1958)]." More importantly, petitioner has many avenues open to him to express his ideas either through the Bar or outside of it. Petitioner may or may not wish to run for election to the Board of Commissioners or the Representative Assembly (see State Bar Rules 5 and 6), but in any event he may attend their meetings, since unless specifically voted to be closed all meetings are open to Bar members. In this way he can have direct input on the two governing bodies of the Bar. Similarly if petitioner has an interest in the Michigan Rules of Evidence, Criminal Code, Land Title Standards or other legislation and rules which the Bar reviews, he may attend the committee meetings and make known his feelings. Petitioner is also free to write letters to the editor of the Michigan Bar Journal

---

[28] In addressing the two dissenting opinions in *Lathrop,* Justice Harlan noted:

"I do not understand why it should become unconstitutional for the State Bar to use appellant's dues to fulfill some of the very purposes for which it was established. I am wholly unable to follow the force of reasoning which, on the one hand, denies that compulsory dues-paying membership in an Integrated Bar infringes 'freedom of association,' and, on the other, in effect affirms that such membership, to the extent it entails the use of a dissident member's dues for legitimate Bar purposes, infringes 'freedom of speech.' " *Lathrop, supra,* 850.

expressing his views and seeking support. If he chooses not to take part in the channels of communication within the Bar and is dissatisfied with the majority position petitioner may express and promote his views through external means such as the communications media.

In sum we find that the State Bar expenditures of dues revenues to fund committees for the purpose of examining proposed legislation and court rules is germane to the state's compelling interest in promoting the administration of justice and advancement in the science of jurisprudence. When taking a position on a proposed bill, rule, or order, the State Bar, however, must confine itself to those subjects directly affecting the administration of justice or the advancement of jurisprudence.[29] Since petitioner has failed to show and we cannot find in the record any specific expenditure of Bar funds to critique or lobby for any legislative or judicial action unrelated to the administration of justice we find that petitioner's rights are not unconstitutionally infringed.

### (2) The Young Lawyers Section and the Right of Association

Petitioner also challenges the constitutionality of the automatic membership of newly admitted attorneys in the Young Lawyers Section (YLS). He contends that such "compulsory" membership violates his First Amendment right to freedom of association since he is being forced to join an organization without his consent and since a part

[29] Thus endorsing a particular candidate for office or lobbying for a bill which is unrelated to the improvement of the administration of justice is outside the scope of State Bar Rule 1 and also violates the First Amendment rights of free speech and association. See fn 8, *supra.*

of his mandatory Bar dues supports the YLS. The State Bar argues that "[n]obody is forcing petitioner to participate in the Young Lawyers Section nor to associate with other young lawyers". The Bar relies on *Lathrop, supra,* 827-828, where the majority of the Justices of the Supreme Court agreed that the Wisconsin State Bar did not, on its face, violate the right to freedom of association, noting: " '[H]is compulsory enrollment imposes only the duty to pay dues' " (367 US 827-828, quoting 10 Wis 2d 237 with approval).

We agree with the State Bar that "there is a definite professional/justice system interest in the integrating of young and new lawyers into the practice of law, and in dealing with the very special problems of these new professionals. Such a structure benefits not only the new attorney, but safeguards the public interest in the maintenance of the highest standards in the practice of law". Petitioner argues that newly admitted lawyers know more general, substantive law and are better "attuned to the most modern currents of thought in the law" than experienced practitioners. It is obvious, however, that most new attorneys necessarily have a substantial gap of practical knowledge and experience. Despite the trend to expose law students to various clinical experiences, law schools still emphasize traditional textbook courses, reasoning that the student will acquire the necessary practical and procedural knowledge after being admitted to the Bar. We take judicial notice that a person is not automatically transformed from a struggling student to a skilled legal practitioner upon completion of the Bar admissions ceremony. The Young Lawyers Section can help the new attorney bridge the gap between law school and the practice of law.

Helping young attorneys find their way through

the maze of rules, regulations and laws in turn helps the legal system run effectively and provides for a better distribution of legal services to the public. If petitioner feels that he does not require this valuable aid he is free to disassociate himself from the section: automatic membership does not mean that it is compulsory.[30] Petitioner, therefore, cannot constitutionally complain that the State Bar uses a portion of its general fund to support a section which is composed of young lawyers who voluntarily give their time and energy to sponsor seminars and programs to train the new attorney. Thus we find that ensuring that the legal system runs smoothly and efficiently is germane to the state's compelling interest of promoting improvements in the administration of justice.

## (3) Prepaid Legal Services (4) Lawyer Referral

## (5) Lawyer Placement (6) Client Security

The use of mandatory dues revenues for sponsoring Lawyer Referral, Prepaid Legal Services, Lawyer Placement and the Client Security Fund is also challenged by petitioner. His primary argument against such expenditures is that they do not constitute a public purpose and have not been authorized in accordance with the provisions of Const 1963, art 4, § 30.[31] Petitioner insists that

[30] Indeed, a Bar applicant could notify the YLS prior to the admissions ceremony of his wish not to become a section member, thereby never being "forced" to join the section. Or a newly admitted attorney can become a member for a trial period and, if dissatisfied, terminate membership.

[31] The State Constitution provides:

"The assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes." Const 1963, art 4, § 30.

Since we have based the Bar's authority to promote the improve-

"[t]he use of State Bar dues monies to enhance the income producing opportunities, employability, and to guarantee trustworthiness of practitioners (via Client Security Fund), is thus invalid as not for a public purpose".[32] A secondary argument raised by petitioner is the all-inclusive charge that the First Amendment right of association prohibits any use of mandatory Bar dues revenue for non-"regulation" purposes.

As to the first argument that the expenditure of Bar funds for the challenged activities is not for a public purpose we note that petitioner's analysis of the purpose of the Bar program is inadequate. Except perhaps for the Lawyer Placement Service, none of the programs were instituted nor are presently conducted primarily for the benefit of attorneys even though, admittedly, some attorneys may benefit incidentally. Lawyer Referral and Prepaid Legal Services[33] were created in order to

ment in the administration of justice and advancement in jurisprudence upon State Bar Rule 1 we will not address plaintiff's attack on the constitutionality of MCL 600.901 et seq.; MSA 27A.901 et seq. See fn 19, supra.

[32] When asked to explain his objections to the Lawyer Referral Service, however, petitioner stated:

"I don't understand why I should be required to subsidize the income-producing opportunities of the attorneys in private practice when I have no interest in enhancing my own income-producing opportunities.

"Q: So it is your own economic interest that is the touchstone of this objection, is that correct?

"A: Yes, and the fact that an agency of the state for which I work precludes me from taking advantage of the service that I am required to subsidize."

[33] Lawyer Referral Service provides members of the public with the opportunity to consult with an attorney for a half an hour for a $15 fee to determine whether a legal problem exists, whether the problem merits further action by an attorney or whether it may be satisfactorily settled by the client. Thus a person seeking a divorce may be referred to an attorney, randomly selected from a list of lawyers competent in that area who agree not to charge over a set amount, while someone wanting to change his or her name would likely be instructed to go to probate court.

Prepaid Legal Services is analogous to Blue Cross insurance in that

make legal services more accessible to "that segment of the population, which studies have shown runs roughly around 70 percent, who do not consult lawyers for one reason or another, partly out of fear of the unknown and of how much lawyers would charge" (testimony of Michael Franck, Executive Director of the Michigan State Bar). See *Bates v State Bar of Arizona,* 433 US 350, 370, fn 22; 97 S Ct 2691; 53 L Ed 2d 810 (1977). Similarly the purpose of the Client Security Fund is not to insure attorneys for malpractice but to protect the public by reimbursing victims of a defalcation either by clients of lawyers or by a lawyer acting in a fiduciary capacity.[34] Therefore Lawyer Referral, Prepaid Legal Services and the Client Security Fund clearly constitute a permissible public service, rather than a private or local service, within the meaning of Const 1963, art 4, § 30.

As to petitioner's First Amendment argument

---

an annual premium is usually paid by an employer and/or employee ensuring that up to a fixed amount of legal services would be available should the need arise. The purpose of Prepaid Legal Services is essentially the same as of Lawyer Referral in that both programs help deliver legal services to members of the public who otherwise might lack legal advice except that Prepaid Legal Services is more extensive in its scope of coverage.

[34] Petitioner admits that the Client Security Fund benefits the public but complains that it does not aid the general welfare of lawyers, "many of whom, like petitioner herein, either do not engage in professional activity related to the protective function of the Client Security Fund, or are precluded from doing so by the State as employer".

Petitioner would have this Court create a mandatory Bar Rule requiring private practitioners obtain insurance to replace the Client Security Fund.

There is a problem that the present malpractice insurance coverage, and indeed the whole concept of insurance, does not include protection for an intentional wrong. As Mr. Franck noted:

"[M]alpractice insurance, by the terms of all the policies, specifically excludes intentional misconduct and only covers errors and omissions to use a general term, so that claims that are eligible for payment by the Client Security Fund would, by definition, not be eligible for coverage under professional liability insurance."

relative to these services, since they either provide legal assistance to those who would otherwise be without it or protect those who do employ lawyers, the relationship to the administration of justice is clear and hence germane to a compelling state interest.

The Lawyer Placement Service presents a closer issue. For a fee of $5 any attorney, newly admitted or an experienced practitioner, may register with the Placement Service for up to 12 months, or until employment is secured. Employers searching for attorneys with certain qualifications are charged a $10 registration fee. The Placement Service acts as an information clearinghouse, gathering application forms and job descriptions and passing the collected information on to the registrants.

Petitioner objects to the State Bar subsidizing the postage, printing, staff and building space of the Placement Service. He perceives this service as being a private purpose within the meaning of Const 1963, art 4, § 30 since at any one time it only benefits a relatively few attorneys. Petitioner claims that Lawyer Placement is just another unnecessary service of the Bar which he is being unconstitutionally compelled to support in violation of his First Amendment right of freedom of association.

Lawyer Placement provides a necessary and useful service for the legal profession and the general public. By providing a focal point for the gathering and dispersal of employment information, the Bar program aids attorneys and society in efficiently utilizing legal skills and services. Placing attorneys where legal services are required aids in the administration of justice. As a consequence, Lawyer Placement, which facilitates

locating attorneys where needed, is germane to the administration of justice.

## (7) Informing the Public of their Legal Rights and Responsibilities

## (8) Lawyers Wives and Children's Charter

Petitioner also objects to the use of Bar funds to promote legal services and to inform the public of the availability and need of legal services. He similarly objects to the use of Bar revenues to fund Lawyers Wives[35] and Children's Charter.[36] Petitioner claims that the use of mandatory Bar dues monies to promote the above activities violates his First Amendment right of association. For example, petitioner, as an unmarried attorney, has no interest in Lawyers Wives whatsoever. Being an attorney, petitioner would also have no need to be informed of the availability of legal services. Nevertheless we hold that the services performed by Lawyers Wives, Children's Charter

[35] Lawyers Wives of Michigan, composed of spouses of both male and female attorneys,

"is an organization which provides a home * * * for spouses of those in our profession. Its particular interest and activity has been in the area of law related education."

Lawyers Wives distributes the booklet "You and the Law" to junior high school students throughout the state; conducts an annual Law Day essay contest for junior high school students; and provides volunteer services in probate and juvenile courts.

[36] Children's Charter of Michigan

"is a Michigan non-profit corporation which is essentially a consortium of juvenile judges, social workers and officers assigned to juvenile work in the various police departments throughout the state, including the Michigan State Police. They deal with collective problems of juvenile delinquency and other juvenile problems that require the interjection of third parties in the process, including non-status offenders. They meet regularly during the summer months at regional conferences to hear papers, to discuss issues and to educate one another on the subject. * * * The contribution has been fixed at $1,000, as Mr. Franck has testified, for some years, in order to underwrite the cost of these conferences which consist of travel for the speakers and renting of the hall."

and the Bar public education communications are germane to the state's interest in improving the administration of justice.

A legal system, no matter how fair or just, is of little value if no one knows of its existence or how to effectively use it. By providing the public with pamphlets explaining various areas of the law in easily understandable language the State Bar is helping Michigan citizens gain effective access to the legal system. Similarly when Lawyers Wives volunteer their time and effort to distribute brochures to school children, conduct Law Day essay contests and serve probate and juvenile courts they are aiding the state legal system. We therefore find that the expenditure of State Bar dues revenue on public communication, Lawyers Wives and Children's Charter is germane to the state's compelling interest in promoting improvements in the administration of justice and advancements in the science of jurisprudence.

### (9) State Bar Social Functions and Judicial Attendance

Petitioner claims the State Bar violates his First Amendment rights of association by expending some of his mandatory dues on offering food and beverages on particular occasions such as the State of the Judiciary Address and Law Day. He also complains that justices and other judges improperly are present at some of these occasions.

To begin with, there is no original jurisdiction in this Court to consider the alleged judicial improprieties, and petitioner is advised to seek the proper forum.

The problem of juxtaposing the majesty of the First Amendment with a minor complaint such as

petitioner's about the offering of food and beverages is that there is a danger of focusing on whether the minor activity rises to the dignity of being a compelling state interest, which, of course, it is not. The pertinent question, however, is whether the minor activity is germane to a more significant activity which fulfills a compelling state interest.

Obviously one can easily imagine dining occasions which have no relationship to the administration of justice or the advancement of jurisprudence whatsoever. Expenditure of funds for these would be offensive not only to the First Amendment but Rule 1. On the other hand, there are other dining occasions that support activities germane to the State Bar's performance of its duties in the improvement of the administration of justice and the advancement of jurisprudence. With that in mind let us focus, for example, on one of petitioner's objections, dining functions in connection with Law Day.

We can take judicial notice that in connection with Law Day there is an essay contest about law-related subjects for young students. The statewide winners, their parents and teachers are brought to Lansing to a Bar-sponsored luncheon attended by prominent attorneys and judges. The highlight of the occasion, of course, is the presentation of awards to the young winners.

Is the use of mandatory bar dues monies for such an occasion germane to the administration of justice? We have already determined that educational programs acquainting the public with the operation and availability of the justice system is germane to the administration of justice. A luncheon of the kind just described is certainly a legitimate expense in the fulfillment of such an

objective and therefore germane to the administration of justice.

We therefore hold that expenditure of mandatory bar dues for the holding of social functions by the State Bar is not per se an invasion of petitioner's First Amendment rights. Such expenditures may be constitutionally permissible if in support of a social function which is a legitimate part of a Bar activity germane to the administration of justice or the advancement of jurisprudence. For example, those in connection with the State of the Judiciary Address and Law Day, if otherwise proper, do not offend petitioner's First Amendment rights.

## (10) Support of Judicial Salaries Before SOCC

Petitioner argues that the appearance by State Bar representatives before the State Officers Compensation Commission (SOCC) to support higher judicial salaries, including salaries of members of this Court, is unlawful and improper. Petitioner claims that the expenditure of Bar resources to send a person to the SOCC is unnecessary to the Bar's "regulatory" function and therefore violates his First Amendment rights of association and speech. He also argues that permitting the State Bar to lobby for higher wages for judges is improper since it violates Canon 2(A) of the Michigan Code of Judicial Conduct[37] as constituting an appearance of impropriety. As to this last objection, we have already indicated that the Supreme Court

[37] Canon 2(A) states:
"Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

is an inappropriate forum in which to initiate such a complaint.

Employment of competent jurists is essential for the effective administration of justice. We take judicial notice that several years ago this country was concerned with the number of eminent federal judges who were resigning due to inadequate salaries. Congress has repeatedly found it necessary to raise the salary of federal judges in order to not only attract, but retain, the top minds of the legal profession who would otherwise engage in private practice. The Michigan Legislature established the SOCC to ensure that top positions in the public sector, such as judges, would be able to compete with the private sector for well qualified and dedicated men and women. By paying competitive salaries the SOCC ensures that the state is not handicapped in drawing and maintaining able jurists. We see nothing improper in the State Bar aiding the state in determining what salaries are necessary to have an effective judiciary, "for the labourer is worthy of his hire". Luke 10:7.

Permitting the State Bar to express its position concerning increases in judicial salaries, whether in favor or opposed, is germane to the state's compelling interest in the administration of justice.

### (11) Use of State Bar's Mailing List for Commercial Purposes

Finally, petitioner contests the use by the State Bar of its mailing list for commercial purposes. He maintains that he is an unwilling recipient of "junk mail" resulting from State Bar commercial mailings in violation of his right to privacy. The Bar admits that it mails insurance and travel company solicitations to Bar members but claims

that it carefully screens the use of the list and takes various safeguards, such as never allowing the list to leave its possession, to ensure that only commercial offers of interest to the general membership will be mailed. Respondent also insists that "both the individual attorney and the State Bar receive a benefit from the programs" since the Bar is totally reimbursed for its mailing service while "individual attorneys receive the benefit of group rates which would otherwise be unavailable". Finally the Bar maintains that there is no right not to receive mail, claiming that the right to privacy does not apply here in any event: "[A]ny intrusion is minimal inasmuch as anyone not wishing to receive such mail may certainly discard it without opening it, since the nature of the communication is clearly indicated on the outside of the envelope".

We disagree. *Rowan v United States Post Office Dep't,* 397 US 728; 90 S Ct 1484; 25 L Ed 2d 736 (1970), which upheld Title III of the Postal Revenue and Federal Salary Act of 1967, 39 USC 4009, now recodified as 39 USC 3008,[38] against constitutional attack, provides guidance on this issue. Although the challenged statute was enacted in order to give recipients of obscene mail the power

---

[38] The recodified statute, virtually unchanged from its predecessor, states:

"(a) Whoever for himself, or by his agents or assigns, mails or causes to be mailed any pandering advertisement which offers for sale matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative shall be subject to an order of the Postal Service to refrain from further mailings of such materials to designated addresses thereof.

"(b) Upon receipt of notice from an addressee that he has received such mail matter, determined by the addressee in his sole discretion to be of the character described in subsection (a) of this section, the Postal Service shall issue an order, if requested by the addressee, to the sender thereof, directing the sender and his agents or assigns to refrain from further mailings to the named addressees." 39 USC 3008, subds (a) and (b).

to remove their names from such mailing lists, *Rowan, supra,* 731-734, the Supreme Court took a broader approach. Chief Justice Burger, writing the opinion for the unanimous Court, noted:

"Without doubt the public postal system is an indispensable adjunct of every civilized society and communication is imperative to a healthy social order. But the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate.

"In today's complex society we are inescapably captive audiences for many purposes, but a sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail. To make the householder the exclusive and final judge of what will cross his threshold undoubtedly has the effect of impeding the flow of ideas, information, and arguments that, ideally, he should receive and consider. Today's merchandising methods, the plethora of mass mailings subsidized by low postal rates, and the growth of the sale of large mailing lists as an industry in itself have changed the mailman from a carrier of primarily private communications, as he was in a more leisurely day, and have made him an adjunct of the mass mailer who sends unsolicited and often unwanted mail into every home. It places no strain on the doctrine of judicial notice to observe that whether measured by pieces or pounds, Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know. And all too often it is matter he finds offensive.

\* \* \*

"[T]he mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer.

"To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communi-

cation, whatever its merit; we see no basis for according the printed word or pictures a different or more preferred status because they are sent by mail. The ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another. See *Camara v Municipal Court,* 387 US 523 [87 S Ct 1727; 18 L Ed 2d 930] (1967)." *Rowan, supra,* 736-737.

Petitioner's right to privacy, "to be let alone", inherently includes the power to have some discretion in what enters his home through the mail. Congress recognized this in passing 39 USC 3008, thereby giving the addressee the authority to stop mailings to his home which he, "in his sole discretion believes to be erotically arousing or sexually provocative". The Supreme Court expanded this power, if only by dicta, to allow the addressee to strike his name from any mailing list. To require the Bar to honor petitioner's request to remove his name from the commercial mailing list would require the burden and added expense of keeping two mailing lists. Depending on how many attorneys opt for removal of their names the Bar may, or may not, be able to maintain the group rates it now provides for its members. Even though petitioner can easily identify the soliciting mailing by its clearly marked envelopes, thereby lessening the intrusion into his privacy, he has the right to demand that his name be excluded from mass merchandising mailing lists since the state cannot be said to be promoting the administration of justice or advancing the science of jurisprudence through this type of mailing.[39]

[39] We restrict our ruling to commercial mailings unrelated to the Bar's authorization to aid in the improvement of the administration of justice and to promote the advancement of jurisprudence. Thus insurance and travel advertisements may be restricted while mailings

## V. CONCLUSION

Petitioner has failed to prove a case for relief in any of the specific categories set forth in his complaint and briefs except for item 11 relating to the sale of the use of the State Bar mailing roster. (But see fn 8.)

Therefore the State Bar shall, on petitioner's request, remove his name from the roster sold for commercial use. With respect to all other challenges petitioner's request for relief is denied.

No costs, a public question being involved.

COLEMAN, C.J., concurred with WILLIAMS, J.

LEVIN, J. The issues, facts and history of this proceeding are set forth in Justice RYAN's and Justice WILLIAMS' opinions.

We have concluded that while the record is sufficiently developed to resolve some of the issues, it is insufficiently developed to resolve others, and therefore the cause should be remanded for a further hearing.

I

The record in this case is sufficiently developed to resolve the challenges to all bar activities save the activities of the Young Lawyers Section and of the Lawyers Wives beyond those directly educating members of the bar and the public about the law and the legal system, the Lawyer Placement Service, the commercial sale of the bar's mailing list, and activities addressed to influencing legislation. Activities addressed to influencing legislation include not only lobbying activities but also the

announcing continuing legal education programs, which plaintiff concedes are within the Bar's proper function, may not be so limited.

adoption of formal bar positions on proposed legislation and social functions in furtherance of legislative activities.

In ordinary litigation, a party's failure to develop an adequate record would, according to the appropriate allocation of the burden of proof, control the disposition of the case. This case is not, however, an ordinary litigation in which a party is limited to the relief to which he has proven himself entitled. Falk's petition calls for the discretionary exercise of this Court's extraordinary superintending control. We must consider, therefore, not merely the relative rights of the parties before us but, rather, the proper organization and actions of the bar in light of the rights of all its members and the interests of the state.

When this Court exercises its power of superintending control, the Court has the responsibility of ensuring that it is fully informed. To allow inadequacies in the record to shape the order affecting the rights of persons other than the parties would be to cede a measure of our discretion to the parties.[1] We conclude that a more complete factual record is needed to determine the appropriate

---

[1] Falk commenced this action as an original proceeding in this Court denominating it "Petition for Special Relief". No statute or court rule expressly authorizes such a petition. If the petition were an ordinary lawsuit claiming violations of Falk's constitutional rights, it should have been filed in a circuit court. If regarded as an action for a writ of mandamus against a state officer, it should have been commenced in the Court of Appeals, or the circuit court for Ingham County or other county in which venue was proper. MCL 600.4401; MSA 27A.4401. This Court has elected to treat Falk's petition as a request to exercise the Court's statutory power to regulate the conduct and activities of the bar. MCL 600.904; MSA 27A.904.

As such, this proceeding is more in the nature of a rule-making proceeding than a lawsuit; what character it has as a lawsuit is the result of this Court's action in appointing a judge to conduct a hearing and make findings of fact.

Since this is not a lawsuit, or even an action whose procedure is delineated by statute, court rule or precedent, it is inappropriate to limit our consideration of the issues presented in this proceeding according to the rules circumscribing lawsuits. To determine the

order as to the bar's legislative activities, the
activities of the Young Lawyers Section and of the
Lawyers Wives beyond those directly educating
members of the bar about the law and the legal
system, the Lawyer Placement Service, and the
commercial sale of the bar's mailing list, and
therefore remand for the purpose of developing
such record.

## II

The controlling decisions of the United States
Supreme Court on the First Amendment issues in
this case, *Hanson*,[2] *Street*,[3] *Lathrop*,[4] and particu-
larly *Abood*,[5] are fully discussed in Justice RYAN's
opinion.

Some may read *Abood* as concluding that any
compelled association and support, whether for
collective bargaining purposes or otherwise, so
intrudes upon the First Amendment rights of indi-
vidual members as to be permissible only for
purposes germane to those activities of the unified
organization which serve compelling state inter-
ests and which cannot be accomplished by means
less intrusive upon the First Amendment rights of
objecting members.[6]

---

scope or content of an order regulating the bar according to burdens
of proof or inadequate showings in the record we ordered would be to
treat this proceeding as the lawsuit it clearly is not.

[2] *Railway Employes' Dep't v Hanson*, 351 US 225; 76 S Ct 714; 100
L Ed 1112 (1956).

[3] *International Ass'n of Machinists v Street*, 367 US 740; 81 S Ct
1784; 6 L Ed 2d 1141 (1961).

[4] *Lathrop v Donohue*, 367 US 820; 81 S Ct 1826; 6 L Ed 2d 1191
(1961).

[5] *Abood v Detroit Board of Education*, 431 US 209; 97 S Ct 1782; 52
L Ed 2d 261 (1977).

[6] The Court in *Abood* observed, as to the collection of dues to
support collective-bargaining activities:

"To compel employees financially to support their collective-bar-

gaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Abood, supra,* p 222.

The Court further observed, as to dues collected for purposes other than collective bargaining:

"Our decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. * * * Equally clear is the proposition that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment. * * * The appellants argue that they fall within the protection of these cases because they have been prohibited, not from actively associating, but rather from refusing to associate. They specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one.

"One of the principles underlying the Court's decision in *Buckley v Valeo,* 424 US 1 [96 S Ct 612; 46 L Ed 2d 659 (1976)], was that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. Because '[m]aking a contribution * * * enables like-minded persons to pool their resources in furtherance of common political goals,' *id.,* at 22, the Court reasoned that limitations upon the freedom to contribute 'implicate fundamental First Amendment interests,' *id.,* at 23.

"The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. * * * And the freedom of belief is no incidental or secondary aspect of the First Amendment's protections:

" 'If there is any fixed star in our constitutional constellation, it is

Others may read *Abood* as providing that while the state interest served by required association and financial support must be a compelling interest, any activity germane to that interest, rather than only those least intrusive upon members' First Amendment rights, is permissible.[7]

that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' *West Virginia Bd of Ed v Barnette,* 319 US 624, 642 [63 S Ct 1178; 87 L Ed 1628 (1943)].

"These principles prohibit a State from compelling any individual to affirm his belief in God, * * * or to associate with a political party * * * as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." *Abood, supra,* pp 233-235.

[7] The Court in *Abood* stated:

"We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward *the advancement of other ideological causes not germane to its duties as collective-bargaining representative.* Rather, the Constitution requires only that such expenditures be financed from charges, dues or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Abood, supra,* 235-236. (Emphasis supplied.)

Where the intrusive limitation on association *directly* affects the First Amendment right of expression (here political expression), as where a statute precludes voting in one party's primary within 23 months after voting in another party's primary, *Kusper v Pontikes,* 414 US 51, 58-59; 94 S Ct 303; 38 L Ed 2d 260 (1973), or where not belonging to a particular political party results in discharge from a government job, *Elrod v Burns,* 427 US 347, 363; 96 S Ct 2673; 49 L Ed 2d 547 (1976) (plurality), the Court has adopted the strict, "least intrusive means" test. For example, in concluding that the Illinois Election Code violated the First Amendment by prohibiting a person from voting in a primary election of a political party if that person had voted in another party's primary within the previous 23 months, Justice Stewart described when and how the least intrusive means test applies:

"[A] significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest. * * * For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. * * * If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper, supra,* pp 58-59.

Alternatively, still others may read *Abood* as applying different standards of judicial scrutiny according to the nature of the activity: dues collected to support collective-bargaining activities may be considered as assessments imposing the cost of obtaining an economic benefit on the beneficiaries, subject to the lower standard of scrutiny outlined in *Hanson* and *Street*,[8] while mandatory

In contrast, where the intrusive limitation on association *indirectly* affects the First Amendment right of expression, as where employees, though free to express their own views without limitation, are required to pay dues to a union which may hold views different from the employees, *Abood, supra,* pp 225-226, the Supreme Court may have adopted the less restrictive "germane" test.

[8] While the Court in *Abood* recognized that compulsory support of collective bargaining activities had an "impact" on First Amendment "interests", and that such support "might well be thought * * * to interfere in some way with an employee's freedom to associate", *Abood, supra,* p 222, the opinion may be read by some as concluding that strict scrutiny was not appropriate to assess that interference. The Court relied on the analysis in *Hanson* and *Street,* saying "the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress". *Id.*

Both *Hanson* and *Street* dealt summarily with the First Amendment issues posed by mandatory dues, initiation fees and assessments for collective bargaining activities. Finding that the congressional provision for union shops was a permissible exercise of the power to regulate interstate commerce, the Court in both cases found that requiring " 'support of the collective-bargaining agency by all who receive the benefits of its work * * * does not violate either the First or the Fifth Amendments' ". As expressed by Justice Douglas, the author of *Hanson,* concurring in *Street:*

"We * * * concluded in * * * *Hanson* * * * that it was permissible for the legislature to require all who gain from collective bargaining to contribute to its cost. That is the narrow and precise holding of the *Hanson* case * * *."

Collective bargaining is an effort primarily aimed at furthering the economic or commercial interests of a union's membership. The commercial nature of conduct claimed to be constitutionally protected has sometime led the Court to adopt a lower standard of protection than is accorded non-commercial activities. Similarly, compelled association and support in furtherance of commercial activities, as distinguished from ideological activities, might be considered by the United States Supreme Court to be less intrusive on First Amendment rights. See, *e.g., In re Primus,* 436 US 412, 437-438, and fn 32; 98 S Ct 1893; 56 L Ed 2d 417 (1978), distinguishing *Ohralik v Ohio State Bar Ass'n,*

dues collected for purposes other than promoting the economic self-interests of members are subject to the higher standard applied in *Abood* to activities not germane to the collective-bargaining process.

Application of the principles announced in *Abood* to the instant case is further hampered by the indefiniteness, on this record, of the purposes and state interests served by the bar. Section 1 of the State Bar Rules, promulgated by this Court pursuant to the Court's powers over the bar and its members, states:

---

436 US 447; 98 S Ct 1912; 56 L Ed 2d 444 (1978), and the solicitation of clients for expressive as opposed to commercial purposes:

"Normally the purpose or motive of the speaker is not central to First Amendment protection, but it does bear on the distinction between conduct that is 'an associational aspect of "expression"' * * * and other activity subject to plenary regulation by government. * * * As shown above, appellant's speech—as part of associational activity—was expression intended to advance 'beliefs and ideas.' In *Ohralik* * * *, the lawyer was not engaged in associational activity for the advancement of beliefs and ideas; his purpose was the advancement of his own commercial interests. The line, based in part on the motive of the speaker and the character of the expressive activity, will not always be easy to draw * * *, but that is no reason for avoiding the undertaking."

It should be noted, however, that the Court in *Abood* said that "[n]othing in the First Amendment or our cases discussing its meaning makes the question whether the adjective 'political' can properly be attached to those beliefs the critical constitutional inquiry". *Abood, supra,* p 232.

Assuming that the State Bar may, without contravening First Amendment rights, engage in activity designed to promote the economic interests of its members, it should be noted that any group similar in size and variety of membership to that of the bar may be expected to face difficult questions when allocating resources. Activities enhancing the economic opportunities of litigators may not similarly benefit corporate lawyers, for example. Indeed, activities such as lobbying for defeat of motor vehicle no-fault insurance legislation might work to further the interests of personal injury litigators at the expense of other types of litigators by committing limited judicial resources to motor vehicle tort actions, thereby increasing delays and other disincentives to the bringing of other types of actions. Such conflicts, and the requirement that members contribute to an association which may, therefore, undercut their self-interests, may not be adequately ameliorated by the democratic process within the bar.

"The state bar of Michigan shall, under these rules,
aid in promoting improvements in the administration of
justice and advancements in jurisprudence, in improv-
ing relations between the legal profession and the pub-
lic, and in promoting the interests of the legal profes-
sion in this State."[9]

This broad statement of purpose is susceptible to
both expansive and restrictive interpretations. On
the one hand, the bar represents the collective
experience of legal experts in many fields, and its
views on legislation as substantive as revisions of
the criminal code, changes to the divorce laws, and
no-fault insurance may serve compelling state in-
terests. On the other hand, the threatened and
actual intrusions upon individual members' First
Amendment rights occasioned by compelled sup-
port of substantive issues to which they are op-
posed may make it proper or even constitutionally
necessary to limit this broad statement of purpose
to the promotion of issues which are directly re-
lated to the practice of law and administration of
justice as defined in their narrowest senses, such
as court reform, lawyers' education, and require-
ments for the practice of law, or to eliminate
entirely bar legislative activities funded by com-
pulsory dues.

The question is made more complex by the
unique relationship between lawyers and the law.
Laws are the tools of the lawyer's trade; to im-
prove those tools generally requires legislative
activity. Laws are the substance of the lawyer's
business; changes in the law will often affect the
economic interests of the profession. Further, both
by training and daily experience, lawyers possess
an expertise in the practical functioning of laws

[9] 340 Mich xxxviii (1954).

and the justice system which may make their views on legislation of unique value.

Yet it is clear that a line must be drawn. The lawyer's relation to the law could rationally support the bar's taking a stand on even the most basic of public policy issues.[10] At some point, the

---

[10] Selections from the record illustrate the bar's tendency to blur the interests of attorneys *qua* attorneys with the general public interest. Unless noted, all questions were posed by counsel for the bar; all answers are those of the Executive Director of the bar.

As to the lobbying activity of the bar:

"*Q.* Mr. Franck, is it not fair to say that given the complexities of society today, given the increasing participation of governmental agencies in the life of our society, that for any group, let alone a formally organized group of lawyers, to function, that there must be constant contact with government at every level by that organization?

"*A.* Yes. And then of course it's particularly true, in my judgment, of the legal profession since its function and contribution to society is to deal with the law and the law, obviously, is the function of the three branches of government. So it is almost by definition that the profession can carry out those functions assigned to it by society only by involving itself in the governmental process which creates the law with which the profession deals.

"*Q.* Ergo the bar must lobby?

"*A.* Yes, sir."

As to the distinction between bar lobbyists and other lobbyists:

"*Q. (Mr. Falk):* The question was: Doesn't a lobbyist for the UAW have an interest in labor. * * *

"*[A].* I'm sure he does, but he is paid to produce a certain result and therein lies a tremendous distinction between any activity the State Bar has with members of the Legislature.

"*Q. (Mr. Falk):* Doesn't the State Bar attempt to get legislation favorable to the legal profession as it views it?

"*A.* To the legal profession, but—and the judiciary, but more important to the public because our profession, as we all recognize, the bottom line is to better serve the public. That's what it's all about.

"*Q. [Mr. Falk]:* Is what constitutes service to the public judgmental or objective?

"*A.* Well, I suppose that what you think is service to the public may be different than what I think, but it is the collective judgment of the State Bar."

As to the political activities, in general, of the bar:

"*Q.* Why are those activities related to the life of the organized bar?

"*A.* Because the life of the profession is to work through law, whether that law is specific statute, court rule, municipal regulation,

and that is where the profession works; that is where its expertise and where its ability to contribute to the public's understanding and development and welfare lies. So those are the areas in which the profession works and the organization of the profession works in those areas as an organization."

As to the types of legislation of interest to the bar:

"*A.* [W]e are now increasingly both choosing to involve ourselves with non-lawyer organizations in the consideration of issues involving substantial elements of public policy and by contrast from the other side major representatives of non-lawyer organizations, consumer organizations, union organizations and organizations of that kind are seeking out the State Bar in the consideration of problems of major public concern and seeking development of appropriate solutions to those problems.

\* \* \*

"*Q.* Are these issues germane to the life of the State Bar?

"*A.* Yes, sir. They involve facets of the administration of justice.

"*Q.* In your opinion, Mr. Franck, are they germane to the life of the . profession of law in this state?

"*A.* Yes, sir.

"*Q.* Why?

"*A.* Because they all affect the contribution of the profession to the evolution and existence of the society in which we live and those unique aspects of societal problems that the law and profession of the law concern themselves with."

"*A.* \* \* \* The entire public skepticism about institutions, about laws, about the obligations of government, has, as we all know, increased dramatically. That has had tremendous ramifications in terms of proposed legislation, areas that are now fair game for legislative intervention so that that has to be considered, for the courts' rule-making powers have increased tremendously and the bar is almost a unique institution, for example, in terms of legislative process, whereas almost every other organization which has a membership component is interested in a very limited number of bills each session. For example, namely only those that affect membership. Most legislation does not directly affect lawyers as members of the State Bar of Michigan, but it does affect lawyers and their clients and their lives, and therefore, compared to other organizations we have an interest in almost every bill that is introduced over in the Legislature.

"*Q.* Now, is that interest in behalf of the profession or is that interest on behalf of the public, in fulfillment of the profession's judiciary responsibilities or a combination of both?

"*A.* It is—

"*Q.* Characterize it.

"*A.* It is really a combination of both. The viewpoint of the lawyers on public questions is very much shaped, obviously, by whom they represent, but in that reflection is the views and the concerns and indeed the experience of their clientele and those persons in the public that they represent. And of course another thing that is unique

interests of the bar and the state in collective legislative activity by the bar must yield to the constitutional freedoms of the individual lawyer.

## III

It is unnecessary at this time to determine the appropriate standard of judicial scrutiny or to definitively articulate the bar's purpose, since such of Falk's challenges to bar activities as can be resolved on this record are clearly permissible even under the strictest standard of review and the narrowest construction of the bar's purpose.

## A

Few would argue, and Falk himself is not one of them, that maintaining high standards of competence and honesty in the legal profession does not serve a compelling state interest. The bar's regulatory and licensing activities narrowly drawn to that end can be justified even if they impinge on members' First Amendment rights. Included among these activities are: continuing legal education, the Michigan Bar Journal to the extent it serves an informational function, advisory opinions on ethical questions, and disciplinary proceedings.

Whatever may be the proper use by the Court of members of the bar to improve the administration of justice, it includes, at the very least, activities primarily to educate the public about the law and legal services, to provide legal services to the indigent, to help the public to select legal counsel

about the profession is that there are lawyers on every issue who reflect every shade of opinion, every portion of the public that would be affected by proposed legislation, indeed has an interest or viewpoint on proposed legislation."

through the Lawyer Referral Service, and to provide forums for discussion of problems facing the courts and the legal profession.

That the state has a compelling interest in improving the administration of justice through activities such as these needs no explication. Compulsory dues are a necessary means both to provide adequate funds and to equitably share the burden among those subject to the duty. Limiting the compulsory element to a reasonable level of dues is the least intrusive means available. No actual participation by Falk is required beyond the financial obligation. This Court and the majority of the profession may rely on the volunteering of time and energy by members of the bar and other groups; without, at a minimum, the financial support to meet the expenses of these activities, they might end or be severely restricted.

Some of the non-legislative bar activities challenged by Falk fall comfortably within the permissible range of this category of activities. Without attempting to be exhaustive, activities such as the preparation and distribution by the Young Lawyers of the Juror's Manual, the distribution to junior high school students of the "You and the Law" booklet by the Lawyers Wives of Michigan, and funding of the Children's Charter, which provides a forum for discussing problems of juvenile delinquency requiring participation of third parties, are examples of clearly permissible activities.

B

Other activities of the bar challenged by Falk, including activities of the Young Lawyers Section and Lawyers Wives other than those described above, the Lawyer Placement Service, the commer-

cial sale of the bar's mailing list, and particularly bar activities addressed to influencing legislation, require development of a fuller and more particularized record before their permissibility can be determined.

On remand, the burden will be on Falk to show specific activities which allegedly infringe upon his First Amendment rights. The burden will be on the State Bar to establish the requisite state interest, the appropriate connection between particular activities and the state interest (or, if a valid criterion for First Amendment purposes, the economic self-interest of the bar's members), and the unavailability or impracticability of alternative means of realizing the asserted state interest. Particular attention should be given to specific evidence of what the bar is doing; how it came to be doing it; how and under what standards it chooses issues on which to take an official stand and which stand to take; whether any ground rules exist for declining to take an official position, with details of instances when the bar has so declined; whether any procedure exists for encouraging, receiving and presenting dissenting opinions; what alternatives are possible to accommodate the First Amendment rights of dissenting members; what impact alternatives will have on the effectiveness of the bar's assistance to its members, the public and this Court; and the proposed times and procedures for implementing alternatives.

We emphasize that the Court is not now deciding, nor intimating an opinion on, either the appropriate standard of judicial scrutiny or a definition of the state interests served by the bar. These issues have been discussed to indicate the kind of record which should be developed on remand and

to provide focus for briefing and argument after remand.

After remand, the Court will also consider, and the parties should address, whether a fair analysis of the purposes served by those bar activities presenting close questions of constitutional conflict and of alternatives thereto indicate that a better course would be to exercise the superintending authority of this Court by court rule to limit the activities of the bar to a greater degree than is absolutely compelled by the Constitution, and thereby eliminate the potential for constitutional conflict. Such an approach may not only serve the important goal of avoiding unnecessary decision of constitutional questions, but may also provide a desirable measure of flexibility in an area that will almost certainly change with time. Further, a proper respect for the "breathing room" necessary for full enjoyment of First Amendment rights suggests that this Court should be reluctant to allow bar activities to press upon the border of constitutional prohibition, absent a clearly demonstrated need therefor.

An appropriate order will enter. No costs, a public question.

KAVANAGH, J., concurred with LEVIN, J.